CRABTREE, J.T.C.
These are consolidated local property tax proceedings wherein the Town of Secaucus seeks review of judgments of the Hudson County Board of Taxation reducing the 1991 and 1993 assessments on property owed by Eugene E. Mori on Paterson Plank Road, Secaucus, New Jersey (Block 227, Lot 9). Mr. Mori seeks direct review of the 1992 assessment on the same property.
The assessments, which were for land only for all years, and the county board judgments for 1991 and 1993 were:
Assessment County Board Judgment
$12,981,300 $10,880,000
The municipality seeks an increase in the assessment for all years under review, while the taxpayer seeks a reduction in the assessment for all such years. For the sake of simplicity and to avoid confusion the municipality will be referred to hereafter either as Secaucus, the municipality, or the taxing district, while Eugene E. Mori will be referred to as the taxpayer. The municipality, however, bears the burden of overcoming the presumption of correctness of the county board judgment for the years 1991 and 1993; the taxpayer bears the same burden for 1992.
Tax year 1991 was a reassessment year in Secaucus. The taxing district filed no cross-petition seeking an increase before the county board for that year, so its relief for 1991 will be limited to a restoration of the original assessment, irrespective of its proofs of value. F.M.C. Stores v. Morris Plains Bor., 100 N.J. 418, 495 A.2d 1313 (1985); Hackensack Water Co. v. Woodcliff Lake Bor., 9 N.J.Tax 545 (Tax 1988).
The general average ratios promulgated by the Director, Division of Taxation, for Secaucus for 1992 and 1993 exceed 100%. *612 The lower limits of the common level range are 88.78% for 1992 and 88.48% for 1993. N.J.S.A 54:1-35a
The subject of the controversy is an L-shaped parcel of vacant land, located in the northeast corner of Secaucus, containing 135.93 acres, of which only 51.11 acres are developable uplands. The balance of the acreage is wetlands. The property has 716 feet of frontage on Paterson Plank Road on the south. It is bordered by Harmon Meadow, a commercial mixed use development of Hartz Mountain Industries (Hartz) on the west, and a complex of industrial and commercial uses on the east. Just beyond that complex is West Side Avenue, a public highway. The rear of the site is bisected in a north-south direction by Cromakill Creek, which is part of the wetlands acreage. The property is subject to the zoning regulations of the Hackensack Meadowlands Development Commission (HMDC).
The southernmost portion (57.5 acres) of the property, including the entire developable 51.11 acres, lies within the Highway Commercial Zone, which includes the following uses: business and professional offices, hotels and motels, restaurants, accessory retail and service uses, and banks.
The area and bulk regulations for the Highway Commercial zone are as follows: minimum lot area — 3 acres; minimum lot width — 200 feet; maximum lot coverage — 40%; minimum front yard — 75 feet; minimum rear yard — 30 feet; minimum side yards — 30 feet any one side; minimum open space — 30%; FAR[1] —0.75.
The northeast portion (49.13 acres) lies within the Light Industrial & Distribution A zone. The permitted uses of the Light *613 Industrial zone are: manufacture or storage of goods and accessory offices; scientific research and development; warehouses; commercial establishments providing supplies and services to industrial customers.
The area and bulk regulations for the Light Industrial zone are: minimum lot area — 3 acres; minimum lot width — 200 feet maximum coverage — 50%; minimum front yard — 50 feet; minimum rear yard — 100 feet; minimum side yards — 90 feet total (at least 30 feet per side); FAR — 2.5.
The northwest portion (29.3 acres) lies within the Research Park zone. The principal permitted uses in the Research Park zone are scientific research and development, office facilities, and warehouses. The area and bulk regulations for that zone are: minimum lot area — 5 acres; minimum lot width — 300 feet; maximum lot coverage — 25%; minimum front yard — 100 feet; minimum rear yard — 100 feet; minimum side yards — 135 feet total (no less than 40 feet per side); minimum open space — 50%; FAR— 2.5.
Taxpayer is a landowner, not a developer. He engaged the services of two engineers, both knowledgeable in planning and development of commercial real estate, to submit a plan for the development of the subject property to the HMDC, the agency with primary jurisdiction over planning and development in the meadowlands. The initial development plan was submitted to the HMDC in January, 1988. That submission contemplated the development of 500,000 square feet of office buildings, 20,000 square feet of restaurants and 500 hotel rooms. This plan was later expanded to provide for two 24-story office buildings and a third 25-story office building containing a total of 3,055,500 square feet serviced by a 5.5-story parking deck containing a total of 7,650 spaces, of which 4,464 would be grade level. The aggregate square footage envisioned by this plan was 4,443,120, including the parking deck but excluding hotels or motels. That density level equates to a FAR of 0.7489, which complies with the HMDC requirement for the Highway Commercial zone. Taxpayer’s engi *614 neering and planning experts anticipated that the development would require 20 — 25 years to complete.
No construction is permitted in the meadowlands without a zoning certificate issued by the HMDC. N.J.A.C. 19:4-4.133. The HMDC’s chief engineer will issue a zoning certificate if, among other things, a traffic circulation system, both on and off-site, is found to be adequate for the proposed use, and is designed to promote maximum safety and to provide access to existing streets, roads, and highways. N.J.A.C. 19:4-4.135. One solution to the traffic access problem was a joint roadway over Hartz’s Harmon Meadow development. Negotiations to that end were conducted between taxpayer and his representatives and officers of Hartz over an extended period of time. To describe these negotiations as protracted and desultory is not inaccurate.
An alternate solution was to build a bridge over Cromakill Creek to West Side Avenue. Approval was obtained from the United States Army Corps of Engineers, but no approval has been secured from the HMDC, either by the assessing dates or since.
Another obstacle was the sewer moratorium in effect in Secau-cus on all the assessing dates. The evidence shows, however, that the moratorium was lifted in March 1993, and that the end of the moratorium was foreseeable on the earliest assessing date, as an extension of the sewer lines was under construction as early as September 1987 and was actually completed in January 1992.
The HMDC has advised the taxpayer’s consultants that it will apply the FAR of 0.75 to the entire parcel of 135.93 acres, even though the buildable area is limited to the 51.11 acres of uplands.
Taxing district’s expert estimated the true value of the subject property to be $27,500,000 on October 1, 1990 (for tax year 1991) and $21,400,000 on October 1, 1991 and October 1, 1992 (for tax years 1992 and 1993). In arriving at these estimates, he relied primarily upon the sales comparison approach, positing a unit value of $13 per square foot for 3,055,500 square feet of building density for tax year 1991 and $11 per square foot for the same *615 square footage of building density for tax years 1992 and 1993.[2] The expert then allowed for off-site development costs of $4 per square foot (an adjustment to which both parties agreed), and arrived at a net unit value of $9 per square foot for tax year 1991 and $7 per square foot for tax years 1992 and 1993.
In developing his value estimates, taxing district’s expert concluded that the highest and best use of the subject property was for mixed commercial uses in conformity with the HMDC zoning regulations applicable to the Highway Commercial zone, i.e., offices, hotels and motels, and accessory retail and service uses.
The expert relied upon nine vacant land sales that occurred between September 27,1987 and January 31,1994. The details of those sales are as follows:
# Location Date Price Acreage Zoning SF/Bidg
1 Jersey City 1/94 $6,000,000 13.348 Redev. $33.22
2 Secaucus 10/90 $6,000,000 18.365 [3] HMDC Lt.Ind’1 $15.00
3 E.Ruthfrd. 12/89 $11,497,073
8/89 + $172,500 13.23 Gen.Ind. & Bus. $29.17
4 No. Bergen 9/87 $6,800,000 [4] 12.756 Highway,
Bus. & Ind. $21.43
5 Brdgwter. 12/93 $6,700,000 44.64 Office &
Service $11.49
6 Brdgwter. 12/88 $23,000,000 117 Ltd. Mfg. $23.00
7 Madison 1/90 $5,000,000 20 PCD-0 $24.63
8 E.Hanvr. 3/92 $4,800,000 34.[5] 1-3 5 $20.87
9 Flrham.Pk. 10/88 $33,000,000 138+ Office $30.00
The expert made a negative adjustment of 20% on all sales for a combination of size and the time required to complete the entire *616 project. As all sales were made with development approvals except sales # 2 and # 5, he made a negative adjustment of 30% for approvals on all sales except sales # 2 and # 5, positing, as he did, that the subject would be sold without approvals. He made positive adjustments of 10% on sales # 2 and # 4 for topography, a negative adjustment of 25% on sale # 1 for use, and a positive adjustment of 5% on sales # 2, # 3, # 4, # 5, # 7 and # 9 for use.
The expert prepared two adjustment grids to account for market condition adjustments.[6] (His other adjustments were the same in both grids). On the premise that commercial land values sharply declined between October 1,1990 and October 1,1991 and stabilized thereafter, he made above-the-line adjustments for market conditions on October 1, 1990 of -15% on sales # 1, # 4 and #8, -5% on sales #4, #6 and #9 and no adjustments on the remaining sales. He made above-the-line adjustments for market conditions on October 1, 1991 and October 1, 1992, of -15% on sales #2, #3 and #7, -20% on sales #4, #6 and #9 and no adjustments on the remaining sales.
After all the adjustments described above, the adjusted sale prices ranged between $9.77 per square foot of buildable area and $19.34 per square foot of buildable area for tax year 1991, and between $8.31 per square foot of buildable area and $16.28 per square foot of buildable area for tax years 1992 and 1993.
Taxpayer’s expert estimated the true value of the subject property to be $6,854,200 on October 1, 1990 (for tax year 1991), $6,070,200 on October 1, 1991, (for tax year 1992) and $5,612,700 on October 1, 1992 (for tax year 1993). In arriving at these estimates he relied solely upon the sales comparison approach. Unlike taxing district’s expert, he ascribed one set of unit values to the upland portion and another set of unit values to the wetlands, relying upon two separate groups of sales. From his group of six upland sales he posited a unit value of $12 per square foot of buildable area for 1991, $10.56 per square foot of buildable area for 1992, and $9.72 per square foot of buildable area for 1993. *617 Upon the basis of five wetlands sales, he posited a value of $3,775 per acre for 84.82 acres for all three years.
His final value estimates then appear as follows:
As of 10/1/90
(a) 544,500 sq. ft. @$12 $6,534,000
(b) 84.82 acres @$3,775 320,200
$6,854,200
As of 10/1/91
(a) 544,500 sq. ft. @$10.56 $5,750,000
(b) 84.82 acres @$3,775 320,200
$6,070,200
As of 10/1/92
(a) 544,500 sq. ft. @$9.72 $5,292,540
(b) 84.82 acres @$3,775 320,200
$5,612,740
Taxpayer’s expert concluded that the property could not be developed under the Highway Commercial zone, as he believed that the existing road network was inadequate to service expanding commercial uses. For that reason, he went on, a large commercial development would require extensive off-site improvements to existing roadways, including road widening and elevated ramps, for which the developer is typically responsible. He opined that the other two zones, namely, the Light Industrial “A” and Research Park, would accommodate a mix of office, research, and warehouse uses at a lesser density and thus require less off-site work on roadways and be more compatible with improvements in the immediate area.
Taxpayer’s expert also observed that consideration of any other use permitted by existing zoning such as office buildings and shopping centers or a combination of both would be speculative and not supportable in the marketplace. Thus he concluded that the highest and best use of the subject property was as a small industrial park of ten plots with a one-story building of 54,450 square feet on each plot.
*618 The expert proffered six sales of industrially zoned vacant uplands. The latest sale occurred on October 1,1990; three of the remaining sales took place in 1987, while two sales were consummated in 1988. The sale prices ranged from $991,500 to $6,000,-000. The unit sale price per square foot of buildable area ranged from $10 per square foot to $15 per square foot. The acreage involved in five of the sales ranged from 4.3 acres to 21.25 acres. The sixth sale involved 37.6 acres, only 22.6 of which were deemed usable. Four of the six sales were of lands in the meadowlands (two in Secaucus, one in North Bergen, one in Little Ferry), and subject to the regulatory control of the HMDC. The lands involved in those four sales were all located in the HMDC Light Industrial zone. The remaining two sales covered land in Elizabeth and Linden, and the properties were located in light industrial zones.
After some minor adjustments for market conditions, and adjustments for location and utility, the prices per square foot of buildable area ranged from $8.82 to $13.70, with an average rate of $11.00.
The subjects of the expert’s five wetland sales were lands in East Rutherford in Bergen County and Jefferson and Passaic Townships in Morris County. Four of the sales took place in 1988, while the fifth sale occurred in 1990. Three of the properties sold for a little more than $3,000 per acre; one property sold for $2,099 per acre, and the remaining property sold for $6,194 per acre.
The most significant issue in this ease is the highest and best use of the subject property.
It has been said that, when the purpose of an appraisal is to estimate market value, a highest and best use analysis identifies the most profitable, competitive use to which the property can be put. Appraisal Institute, The Appraisal of Real Estate, 275 (10 ed. 1992). Highest and best use is defined as “the reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially *619 feasible, and that results in the highest value.” (Emphasis supplied) Id. at 275. The following statement appears later in the same text:
The highest and best use of both land as though vacant and property as improved mast meet four criteria. The highest and best use must be legally permissible, physically possible, financially feasible, and maximally productive. These criteria are often considered sequentially. Tests of legal permissibility and physical possibility must be applied before the remaining tests of financial feasibility and maximal productivity. A use may be financially feasible, but this is irrelevant if it is physically impossible or legally prohibited. Only when there is a reasonable possibility that one of the prior, unacceptable conditions can be changed is it appropriate to proceed with the analysis____
[Id. at 280]
The four criteria for determining highest and best use have been recognized in this court. Ford Motor Co. v. Edison Tp., 10 N.J.Tax. 153 (Tax 1988), aff'd o.b. per curiam, 12 N.J.Tax 244 (App.Div.1990), aff'd 127 N.J. 290, 604 A.2d 580 (1992).
The first element of the highest and best use test is whether a proposed use is legally permissible. In this connection, the uses permitted by the applicable zoning regulation determine whether a proposed use is legally permissible. Romulus Dev. Corp. v. West New York, 7 N.J.Tax 305 (Tax 1985), aff'd o.b. per curiam, 9 N.J.Tax 90 (App.Div.1987); Schimpf v. Little Egg Harbor Tp., 14 N.J.Tax 338 (Tax 1994). In this case, the subject’s 51.11 acres of buildable uplands lie entirely within the HMDC Highway Commercial zone, which permits business and professional offices, hotels, restaurants, and accessory retail and service uses. The Highway Commercial zone also authorizes an FAR of 0.75, which, the evidence shows, may be applied to the entire parcel, including the 84-acre non-buildable wetlands portion. The HMDC has advised taxpayer that it would review any application for development of the property in the context of an FAR of 0.75, including above-grade parking decks, but excluding hotels and motels.
Taxing district’s engineer submitted a concept plan which projected the construction of two 24-story and one 25-story office structures containing a total of 3,055,500 square feet serviced by 7,650 parking spaces in a five and a half-story parking deck. The *620 FAR reflected in the concept plan was 0.7489, including the parking deck.
It seems clear, then, that the highest and best use posited by taxing district’s expert meets the legally permissible test.
The second element of the highest and best use criteria is whether the proposed use is physically possible. There appears to be no dispute that the proposed mixed use development consistent with the HMDC zoning regulations applicable to the Highway Commercial zone may be physically constructed. The only conceivable impediments are availability of adequate sewer connections and the adequacy of traffic arrangements.
The standard appraisal text recognizes that an appraiser must consider the capacity and availability of public utilities, including a public sewerage system, the absence of which severely limits the use to which a property may be put. See Appraisal Institute, The Appraisal of Real Estate, supra, at 282. In this case, the evidence shows that a sewer moratorium was in effect in Secaucus during all the tax years under review. The evidence also shows that the moratorium was lifted in March 1993. The test to be applied to any post-assessing date events which may impact the true value of the subject property is whether these events were reasonably foreseeable on the assessing dates. Fort Lee v. Invesco Holding Corp., 3 N.J.Tax 332 (Tax 1981), aff'd and remanded on other grounds 6 N.J.Tax 255 (App.Div.1983), certif. den. 94 N.J. 606, 468 A.2d 238 (1983); Inwood at Great Notch v. Little Falls Tp., 6 N.J.Tax 316 (Tax 1984). In this case, the credible evidence indicates that the construction of the sewer extension was underway in 1990, having been commenced in September 1987. The extension was completed in January 1992. I conclude from these facts that the availability of sewers to serve the proposed mixed use development was reasonably foreseeable on all three assessing dates, and thus, the physical possibility of the proposed use was not jeopardized by the absence of sewers.
The traffic issue is more complicated. HMDC regulations state that the HMDC chief engineer must be satisfied that the *621 traffic circulation system, both on and off site, is adequate for the proposed use, and is designed to promote maximum safety and to provide access to existing streets, roads, and highways. N.J.A.C. 19:4-4.135. To that end, taxpayer’s representatives — and taxpayer, himself — negotiated over an extended period of time with Hartz, the owner of the adjoining Harmon Meadow mixed use commercial development, for a joint roadway over Harmon Meadow to the public highway; but, to no one’s surprise, Hartz was not inclined to cooperate with a potential competitor in a soft office building market. Taxpayer’s engineer and professional planner submitted alternative proposals to the HMDC, one of them involving a fifty to sixty-foot wide driveway over Cromakill Creek to West Side Avenue. This alternative required a permit from the United States Army Corps of Engineers (USACOE) to cross Cromakill Creek, to fill a small portion of the wetlands, and to construct two drainage outflows into the Creek. USACOE has granted that permit, but at the time of trial, the HMDC had not approved.
The other alternative was to construct on-site roadways leading to Paterson Plank Road, a principal public highway abutting the subject on the south. Still another alternative, proposed by the HMDC, was that taxpayer construct a 100-foot wide right-of-way, called Park Place East, connecting the Hartz and Mori properties in Seeaucus to West Side Avenue in North Bergen, at an approximate cost of $1,000,000. Without belaboring the point, it appears that the HMDC would require that taxpayer expend approximately $1.5 million for off-site traffic improvements as a condition of HMDC approval of taxpayer’s application to develop the property in accordance with HMDC zoning requirements. The authoritative appraisal text tells us that physical limitations that prevent a site from achieving its optimal use may often be overcome by applying additional capital. Appraisal Institute, The Appraisal of Real Estate, supra, at 280. In the view of the prospective purchaser, the expenditure of $1.5 million is a mere bagatelle compared to the return from a finished mixed use commercial development of some three million square feet.
*622 Accordingly, I conclude that the traffic issue, while nettlesome, is not an insurmountable obstacle to development of the subject property in accordance with HMDC zoning, and that such development is physically possible within the context of a highest and best use determination.
The next standard of highest and best use is financial feasibility. In this connection, Seeaucus proffered the testimony of Hugh A. McGuire, Jr., a valuation expert, knowledgeable about commercial real estate development in the meadowlands. Utilizing cost data from Marshall Valuation Service, he posited total project costs, including land acquisition costs, of $311,816,970 for 3,055,500 square feet of office buildings and 1,379,000 square feet for a parking garage. He then posited gross income for the office buildings at $59,582,250 ($19.50 per square foot), a 10% vacancy and loss allowance, expenses, including taxes, of $19,096,875, with a resulting net income of $34,527,150. The next step was the assumption of a 9% mortgage loan granted by an insurance company or pension fund for 70% of the total acquisition cost, amortizable over 25 years, with an equity contribution of the remaining 30%. The equity contribution was $93,545,091, and the cash-on-cash return was $12,305,709, or 13%.
The same exercise was employed to determine whether the proposed use was maximally productive. Mr. McGuire’s analysis of the return potentially available under the use proposed by taxpayer’s expert demonstrated the superiority of the use posited by taxing district’s expert, i.e., mixed use development in accordance with HMDC zoning, over the use posited by taxpayer’s expert.
Accordingly, I conclude that the use posited by taxing district’s expert is not only financially feasible but is the most productive. It is important to observe that unlike valuation conclusions, which depend in large measure upon hard data for their support, the financially feasible and maximally productive aspects of the highest and best use analysis do not, by their very nature, lend themselves to the precise quantification required from *623 valuation proofs. The primary standard, after all, is identification of the reasonably probable use, Appraisal Institute, The Appraisal of Real Estate, supra, at 275; that use, to be sure, must not be remote, speculative, or conjectural. Six Cherry Hill, Inc. v. Cherry Hill Tp., 7 N.J.Tax 120 (Tax 1984), aff'd o.b. per curiam 8 N.J.Tax 334 (App.Div.1986). Mr. McGuire’s testimony went beyond the remote, speculative, or conjectural. He supported his acquisition cost projections by reference to a recognized cost service used by most valuation experts, and for his land value, he incorporated the valuation estimate of the municipality’s valuation expert.
It seems appropriate to observe at this point that the process involved in valuation proceedings in this court is that of judicial review, which means that cases are decided in an adversarial setting on the basis of the preponderance of the evidence (subject, in all cases, to the satisfaction of the relevant rules involving presumptions and the burden of proof). It should also be noted that our Supreme Court has admonished us to be cognizant of the expense incurred by litigants in engaging experts, and to keep the volume of information required to support an expert’s opinion within practical and realistic limits. Glen Wall Assocs. v. Wall Tp., 99 N.J. 265, 280, 491 A.2d 1247 (1985).
In this case, the credible evidence preponderates in favor of the municipality.
Thus, in view of all the foregoing, I find that the highest and best use of the subject property, on all the valuation dates, is for mixed commercial development in accordance with HMDC zoning regulations applicable to the Highway Commercial zone.
At this point, it is appropriate to address the presentation of taxpayer’s expert and to respond to taxpayer’s arguments.
The premise of the valuation proofs submitted by taxpayer’s expert is fatally flawed. The expert assumes that development on the subject property would take place as though the property were zoned Light Industrial, or Research Park. The fact remains, however, that the 51.11 acres of buildable uplands lie *624 completely within the Highway Commercial zone, which does not permit the uses assumed by defendant’s expert. The subject could be developed in the manner suggested by defendant’s expert only if the zoning were changed. “The first and most important test for determining highest and best use is whether the alternative use is legally permissible.” Schimpf v. Little Egg Harbor Tp., supra, 14 N.J.Tax at 346; Romulus Dev. Corp. v. West New York, supra, 7 N.J.Tax at 318. It must be shown that there was a reasonable probability of a zoning change in the near future. State v. Gorga, 26 N.J. 113, 138 A.2d 833 (1958); State v. Caoili, 135 N.J. 252, 639 A.2d 275 (1994); Hoechst Celanese Corp. v. Bridgewater Tp., 12 N.J.Tax 532 (Tax 1992). There was no such evidence in this case. On the contrary, Mr. McGuire testified that from his intimate knowledge of the meadowlands and the policies of the HMDC, a zoning change was highly improbable. As taxpayer’s expert has failed to satisfy the legally permissible test, his conclusions concerning the market demand for light industrial use and a corresponding absence of such demand for office building development are irrelevant. If the test of legal permissibility of a proposed use (in this case, light industrial use) is not met, the fact that such proposed use may be financially feasible may not even be considered. Appraisal Institute, The Appraisal of Real Estate, supra at 280.
Accordingly, taxpayer’s expert’s conclusion concerning the highest and best use of the subject property carries no probative weight, and the court rejects his valuation proofs in their entirety.[7]
Taxpayer challenges Mr. McGuire’s cost estimates for the construction of the office buildings and parking deck by submitting, for the first time on brief, extracts from Marshall Valuation Service. These extracts were not submitted at the trial, either during counsel’s cross examination of Mr. McGuire or at any other time. Counsel’s conduct in proffering critical evidentiary matter at a stage in the proceeding when his adversary has no opportuni *625 ty to respond is, to say the least, inappropriate. In like manner, counsel’s belated post-trial submission of a proposed downsizing of the Highway Commercial zone (reducing the permissible building density) included in what is known as the Special Areas Management Plan (SAMP) is, likewise, inappropriate. To be sure, the pending implementation of SAMP was disclosed in general, nonspecific terms during the trial, but its implementation at any time in the foreseeable future was a mere chimera, or, as this court observed in another case, “the SAMP program was little more than a gleam in a regulator’s eye.” Bergen County Assocs. v. East Rutherford, Bor., 12 N.J.Tax 399, 414 (Tax 1992), aff'd o.b. per curiam 265 N.J.Super. 1, 625 A.2d 524 (App.Div.1993) certif. denied 134 N.J. 482, 634 A.2d 528 (1993).
A representative of Cushman & Wakefield, a firm active in the sale and rental of office buildings, testified for taxpayer on the soft office rental market prevailing during the period of time embraced by the valuation dates. The witness challenged Mr. McGuire’s conclusions concerning financial feasibility and maximal productivity by describing in some detail the status of the office rental market. There was a glut of office buildings; vacancies were at an all-time high, and rent concessions abounded. If one were to view the office rental market on a spot date, or more specifically, on the three valuation dates under review, one might agree with the witness. The point of a highest and best use analysis, however, is to evaluate the long term prospects of a mixed use commercial development. As the authoritative appraisal text indicates, the appraiser, to determine financial feasibility, estimates the future gross income that can be expected from a proposed use. Appraisal Institute, The Appraisal of Real Estate, supra at 282. By way of analogy, in estimating the vacancy and loss allowance in arriving at the estimate of value of income property, the appraiser does not rely upon vacancy and loss conditions in the marketplace on a spot date; rather, he projects the long term quality and durability of the income stream. University Plaza Realty v. Hackensack, 12 N.J.Tax 354 (Tax 1992), aff'd 264 N.J.Super. 353, 624 A.2d 1000 (App.Div.1993) certif. *626 denied 134 N.J. 481, 634 A.2d 527 (1993); RTC Properties v. Kearny, 13 N.J.Tax 146 (Tax 1993). Mr. McGuire’s projections were over a long term. After all, the evidence shows that completion of the proposed development would take twenty to twenty-five years. Moreover, the adjoining Harmon Meadow office and retail complex developed by Hartz was begun in a soft market. From all indications, it is prospering now, even in a soft market.
Taxpayer argues that his failure to obtain development approvals for the subject property, even though his initial application for mixed use development in accordance with existing zoning was filed with the HMDC as long ago as 1988, demonstrates the unsuitability of the property for development under the HMDC’s Highway Commercial zone. Taxpayer misapprehends the nature of ad valorem property taxation.
The ultimate fact to be determined in any tax valuation proceeding is the full and fair value, sometimes referred to as the true value, of the subject property, i.e., the price a willing buyer would pay a willing seller. New Brunswick v. Div. of Tax Appeals, 39 N.J. 537, 189 A.2d 702 (1963). The hypothetical transaction presupposes a knowledgeable buyer. Presidential Towers v. City of Passaic, 6 N.J.Tax 406 (Tax 1984) aff'd 7 N.J.Tax 655 (App.Div.1985). The hypothetical sale to the hypothetical buyer assumes a sale to a buyer whose requirements are accommodated by the property in question. CPC International v. Englewood Cliffs, 193 N.J.Super. 261, 473 A.2d 548 (App.Div.1984); Riegel Products Carp. v. Milford Bar. 13 N.J.Tax 546 (Tax 1994). The focus is on the property’s market value, not on the circumstances of the owner. Glen Wall Assocs. v. Wall Tp., 99 N.J. 265, 491 A.2d 1247 (1985). Thus, the inquiry focuses on the profile of the hypothetical purchaser, who is assumed to be a knowledgeable, sophisticated developer. The status of taxpayer, who is a landowner, not a developer, is irrelevant. It is inconceivable that an experienced, knowledgeable developer would pursue taxpayer’s course of action (or non-action) and supinely await the *627 unraveling of events, doing nothing to expedite matters subsequent to the filing of the initial development application in 1988.
This brings us to an examination of the comparable sales proffered by taxing district’s expert.
The properties involved in that expert’s comparable vacant land sales are, for the most part, located in zones similar to the HMDC Highway Commercial zone. The differences between those com-parables and the subject are anticipated, and they are dealt with by adjustments which recognize and explain the differences; the comparables and the subject are then related to each other in a meaningful way, to arrive at an estimate of value. Glenpointe Assocs. v. Teaneck, 241 N.J.Super. 37, 574 A.2d 459 (App.Div.), certif. den. 122 N.J. 391, 585 A.2d 392 (1990). The adjustments are found, primarily, in two areas: approvals and size. The expert makes a negative adjustment of 30% in seven of his nine sales for approvals, i.e., those sales which were made with development approvals in place. He assumed that the subject would be sold without approvals. The remaining adjustment, also a negative one, was 20% for size in all sales. While this court has taken a jaundiced view of adjustments totalling 50% or more, Owens-Illinois Glass Co. v. Bridgeton, 8 N.J.Tax 495 (Tax 1986); M.I. Holdings, Inc. v. Jersey City, 12 N.J.Tax 129 (Tax 1991), the adjustment for “size” is actually a discount reflecting the time value of money, emanating from the time required to develop a mixed use commercial development of over three million square feet. It is reasonable to assume that a developer would pay less for a vacant parcel currently, when the realization of a return on his investment is perforce deferred for as long as twenty-five years.
A final word is in order about the role played by the wetlands in this valuation exercise. No separate value is assigned to the wetlands acreage, as its value is contributory, i.e., while no building can take place in the wetlands, the acreage may be counted in determining compliance with the HMDC’s building coverage (FAR) requirements;
*628 In view of the foregoing, I find the true value of the subject property on the assessing dates to be $27,500,000 on October 1, 1990 for tax year 1991, and $21,400,000 for October 1,1991 (for tax year 1992) and the same for October 1, 1992 (for tax year 1993). These values have been determined by multiplying the total potential buildable area of 3,055,500 square feet by $9 per square foot (net of $4 per square foot of off-site costs) for tax year 1991, and by $7 per square foot (net of $4 per square foot of off-site costs) for each of the tax years 1992 and 1993.
As indicated at the outset, Seeaucus filed no timely cross-petition for an increase at the county board for 1990, a revaluation year. Hence, the assessment for that year will be affirmed. For 1992 and 1993, however, chapter 123 (N.J.S.A. 54:51A-6, in the Tax Court) applies, and the assessments for those years may be increased, notwithstanding taxing district’s failure to file a cross-petition in the county board or a counterclaim in this court. Weyerhaeuser Co. v. Closter Bor., 190 N.J.Super. 528, 464 A.2d 1156 (App.Div.1983). See F.M.C. Stores Co. v. Morris Plains Bor., 100 N.J. 418, 428-430, 495 A.2d 1313 (1985), (court distinguishes a municipality’s claim for increased assessment in year to which chapter 123 does not apply.)
The general average ratio for Secaucus, for both 1992 and 1993, exceeded 100%. The lower limits of the common level range for those years was 88.78% and 88.48%, respectively. As the ratio of the assessment to the true value as herein found for those years is below the lower end of the common level range, the assessment will be increased by application of the general average ratio to the true value, except that the assessment may not exceed 100% of the property’s true value. Abe Schrader Corp. v. Seeaucus, 8 N.J.Tax 390 (Tax 1986).
Thus, judgment will be entered indicating the assessment for each year to be as follows:
*629 1991
Laña- $12,981,300 Improvements -0-
Total $12,981,300
1992
Land- $21,400,000 Improvements -0-
Total $21,400,000
1993
Land- $21,400,000 Improvements -O-
Total $21,400,000

 FAR means floor area ratio, which is the relationship between the above-ground floor area of a building and the area of the plot on which, it stands. Appraisal Institute, The Dictionary of Real Estate Appraisal, 147 (3d ed.1993). The FAR is expressed as a decimal, e.g., a ratio of 2.0 indicates that the permissible floor area of a building is twice the total land area. Id. As will be seen later in this opinion, the FAR approved by the HMDC for the subject property is 0.75, which means that the improvements, exclusive of hotel/motel use but inclusive of parking garages, may not exceed 75% of the total land area.

 The expert originally assumed a larger density of 4,440,833 square feet of offices. He modified his assumptions when he learned of the concept plan, which contemplated 3,055,500 square feet of offices. The expert also utilized the income approach, but as that approach is predicated solely on projections and not hard data, the court rejects it as having no probative value.

 The total acreage involved in this sale was 37.599, of which only 18.365 was usable.

 The buyer purchased the site "as is” and demolished an existing building at a cost of $700,000, including site preparation.

 This apparently comprehends mixed use office and retail.

 What used to be called "time” is now referred to as "market conditions."

 It is worthy of note that by his own admission, none of the buildings anticipated under his comparables could legally be constructed on the subject.