KAHN, J.T.C.
This is the court’s determination with respect to plaintiff taxpayer’s appeal of the municipality’s assessment on the subject property for tax years 1993, 1994, 1995 and 1996. Tax year 1993 was a revaluation year, and the relevant Chapter 123 ratios (N.J.S.A. 54:l-35a) were as follows:
Year Ratio
1993 100% (revaluation year)
1994 87.27%
1995 87.70%
1996 87.57%
The subject property in the Borough of Carlstadt involves individual municipal tax lots, Block 131, Lots 9.0 (5.949 acres), 9.01 (7.973 acres) and 9.02. (5.58 acres), formally known as Block 131.1, Lots 66, 66.01, 66.02, respectively, which were assessed as follows:
Valuation Date Lot 9.0 Lot 9.01 Lot 9.02 Total
10/01/92 $749,700 $2,511,500 $1,757,700 $5,018,900
10/01/93 $749,700 $2,511,500 $1,757,700 $5,018,900
10/01/94 $749,700 $2,511,500 $1,757,700 $5,018,900
10/01/95 $749,700 $2,511,500 $1,757,700 $5,018,900
While both parties utilized the comparable sales valuation approach, they differ in their determination of highest and best use. The highest and best use analysis recognizes the most profitable, competitive use to which a property can be put. Mori v. Town, of Secaucus, 15 N.J.Tax 607, 618 (Tax 1996), citing Appraisal Institute, The Appraisal of Real Estate 275 (10th ed.1992). This court has repeatedly relied on Ford Motor Co. v. Edison Tp., 10 N.J.Tax 153 (Tax 1988), aff'd o.b. per curiam, 12 N.J.Tax 244 (App.Div.1990), aff'd, 127 N.J. 290, 604 A.2d 580 (1992), for the criteria used to determine the highest and best use of property. In that case Judge Andrew held “that [i]n order for a particular use to be the highest and best it must be: 1) legally permitted, 2) physically possible, 3) economically feasible, and 4) the most profitable.” 10 N.J.Tax at 16 (citation omitted).
*412 The subject property is controlled by the zoning jurisdiction of the Hackensack Meadowlands Development Commission (HMDC) and is zoned for Light Industrial and Distribution “A” development. Municipal zoning is preempted by the HMDC. N.J.S.A. 13:17-11(b). The HMDC zoning allows the construction of warehouse, distribution and/or other light manufacturing facilities. Taxpayer, an established real estate developer in the Hackensack Meadowlands District, contends that various restrictions placed upon the filling of the property on the valuation dates in question rendered the property undevelopable and, as such, the highest and best use of the property was for wetlands or for conservation. The municipality argued otherwise, based primarily on the fact that in March 1996, subsequent to the last of the relevant valuation dates, (October 1, 1995), taxpayer received permission to fill the property.
Taxpayer contracted to purchase lots 9.01 and 9.02 in January 1985. These two lots are considered, for purposes of this appeal, as one parcel and referred to as the “13.5-acre parcel.” This lot is adjacent to a 44-acre parcel the taxpayer owned at that time. Lot 9.0, a 5.949-acre parcel purchased at approximately the same time as the 13.5-acre parcel, is triangular in shape and abuts the eastern boundary of the 13.5-acre parcel and has been referred to, for purposes of this appeal, as the “6-acre parcel.” Prior to closing on the subject property, taxpayer began to fill the 13.5-acre parcel in preparation for light industrial development. His activity was halted when the United States Army Corps of Engineers (ACE) received an anonymous telephone call reporting illegal filling. On March 25, 1985, taxpayer was notified that the property was protected wetlands under the Federal Water Pollution Control Act (also known as the Clean Water Act (CWA)), 33 U.S.C.A. §§ 1251-1387 (West Supp.1997). An oral cease and desist order was imposed on future filling[1] by the ACE, and the entire 13.5-acre parcel was determined to be “navigable waters” subject to the ACE’s authority under Section 10 of the Rivers and *413 Harbors Appropriations Act of 1899, 33 U.S.C.A. §§ 401, 403 (West Supp.1997). No other filling was performed on the property until March 1996 when a fill permit was issued. The entire 6-acre parcel was also considered “navigable waters” under Section 10 of the River and Harbors Appropriations Act.
On all relevant valuation dates, both the 13.5-acre parcel and the 6-aere parcel consisted primarily of wetlands. Wetlands are defined by United States Environmental Protection Agency (EPA) regulations as “areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions.” 40 C.F.R. § 230.41(a)(1) (1997). Taxpayer offered the testimony of George Cascino as an expert on wetland delineation and verification. Mr. Cascino testified as to various characteristics of the subject property which he then classified as mostly wetlands. Defendant did not dispute or contradict this characterization. Taxpayer also offered into evidence an April 15, 1992 jurisdiction ruling by the ACE which delineated the existence of wetlands on the 13.5-acre parcel.
The wetlands on both the 13.5-acre parcel and the 6-acre parcel were described as generally unsuitable for fill and development by the Advanced Identification Project (AVID). AVID was carried out under the supervisory control of the EPA as a combined effort of the HMDC, EPA, the ACE and other state and federal agencies. Mr. Cascino testified that AVID’s description of the subject property as “generally unsuitable” for future development made it unlikely that any proposed filling and development would comply with Section 404 of the CWA, 33 U.S.C.A. § 1344, or that any permits would be issued for filling and development. Under Section 404 of the CWA, a permit from the ACE is required prior to any filling or development of property governed by the CWA.
The subject property has been involved in various litigation and permit proceedings prior to and throughout all relevant valuation dates. Taxpayer submitted two voluminous binders of memoranda and correspondence dealing with the permit proceedings *414 throughout the valuation dates at issue. It is imperative that this court examine the history of the permit proceedings before and during the relevant valuation periods to develop any conclusion regarding the ability to develop the subject property.
After the ACE issued a formal cease and desist order preventing the resumption of filling the 13.5-acre parcel in 1985, taxpayer continually sought to obtain the necessary fill permits. Taxpayer introduced a letter into evidence from the ACE dated March 23, 1987, which consisted of a notice of intent to issue a permit which would have allowed him to continue filling the property. Both the EPA and United States Fish and Wildlife Service (FWS) objected to the ACE’s notice of intent letter.
On January 19,1988, the EPA recommended a Section 404 veto under the CWA to prevent filling of the remaining portion of the 13.5- acre parcel. The EPA recommendation described both the 13.5- acre parcel and the 6-acre parcel as of unique significance to the Hackensack Meadowland District. As such, the EPA determined that the parcels should be preserved in their natural state. The official EPA veto under the CWA was then issued on March 21,1988. The 13.5-acre parcel received the first veto ever issued in New Jersey under Section 404 of the CWA. The veto precluded development of the parcel by preventing the ACE from issuing a fill permit. Taxpayer appealed the veto to the federal District Court, along with other issues involving the 44-acre adjoining the subject parcels owned by Mr. Russo. The District Court remanded the taxpayer’s claims to the ACE for reconsideration of the permit application for the 13.5-acre parcel.

Valuation Date: October 1, 1992

After further consideration during April 1992, the ACE determined that a 3.27-acre portion of the 13.5-acre parcel was uplands prior to the taxpayer’s filling activity during 1985, and the remainder of the property was subject to Section 404 of the CWA and the EPA’s veto. Also, the ACE established various requirements which required satisfaction prior to any future consideration of fill applications. Taxpayer again instituted litigation in the federal *415 District Court against the ACE and EPA in June 1992 seeking review of the ACE’s April 1992 determination.
Defendant stipulated at trial before this court that Mr. Russo could testify as an expert with respect to development of property within the Hackensack Meadowland District. The taxpayer contends that any development of the 3.27-acres the ACE determined to be upland would be impractical for commercial, light industrial purposes. This court finds his undisputed testimony to be reliable. As of the October 1, 1992 valuation date for the 1993 tax year, taxpayer had not obtained the necessary permits to continue filling the property and develop it, nor was it known when or if he would ever obtain the necessary permits.

Valuation Date: October 1, 1993

The District Court granted partial summary judgment to the ACE in December 1992. The remaining claims, however, were used by the taxpayer as, what he termed, a “wedge” compelling further negotiations among the parties throughout 1993. In January 1993, taxpayer embarked on a series of negotiations with the EPA and the ACE after which he was informed that he would have to reapply for fill permits pursuant to those negotiations. The record reveals that taxpayer sent a letter to the ACE on January 22, 1993 responding to all of the ACE’s requirements necessary for the lifting of the EPA’s veto and the filling and development of the property. However, no permits were forthcoming.
Also during this period of negotiation, Mr. Russo instituted a claim in the United States Court of Federal Claims for compensation in excess of $10,000,000, claiming that there was a temporary taking of the subject property by the federal government through its delayed rulings on the issuance of fill and development permits. During negotiations with the government agencies throughout 1993, the EPA proposed a “global settlement” of all issues concerning Mr. Russo’s various properties. He delayed pursuing the Court of Federal Claims action to continue the proposed global settlement negotiations. During September 1993, taxpayer and *416 the federal agencies had agreed upon a proposed oral settlement which, in essence, would allow the taxpayer to continue with the development of the subject property. However, this development was conditioned upon the taxpayer obtaining the necessary permits from all federal and state agencies, as well as requiring Mr. Russo to deed title and fund mitigation[2] costs for property he owned in Ridgefield, New Jersey to the HMDC’s Mitigation Bank, or other organization designated by the ACE. It was undisputed at trial that the value of the property in Ridgefield exceeded $1,000,000.
The negotiations between taxpayer and the government agencies soon broke down again. There was no written settlement agreement as of October 1, 1993, and taxpayer was no closer to receiving development permits then he was on October 1,1992. It is unreasonable to believe, as the municipality contends, that someone other than Mr. Russo could have received the permits and would view the subject property as “developable” as of this date. The municipality’s appraisal expert suggests that a reasonable purchaser would believe that the property at issue was developable as of the valuation date. Neither party introduced any evidence suggesting that: A) the necessary permits would be issued; B) the land could be developed as of October 1, 1993; or C) a reasonable purchaser would believe this property, still subject to the rare EPA veto under Section 404 of the CWA, could ever be filled and developed. The fact that there were settlement negotiations during September 1993 is of no consequence. No reliable evidence was provided to persuade this court to find that the granting of permits allowing development of the property was close at hand.

Valuation Date: October 1, 199h

In February 1994, Mr. Russo, not foreseeing successful settlement of the development problems, indicated to the EPA and the *417 ACE that he would reinstate his complaint in the Court of Federal Claims. Taxpayer submitted into evidence the U.S. Attorney’s agenda for a proposed settlement meeting on February 14, 1994. That agenda stipulated that permits under Section 10 of the River and Harbors Act and Section 404 of the CWA would take “1-2 years to issue” if the EPA veto was lifted. Needless to say, no reasonable developer could think development of the property was inevitable since development was based upon the lifting of the veto.
The record reveals that in April 1994, Mr. Russo and various federal agencies entered into settlement negotiations which again failed. In May 1994, taxpayer notified the ACE and other relevant government agencies that a settlement was neeessary prior to June 15,1994 because the Water Quality Certification waiver he had obtained several years prior from the New Jersey Department of Environment (NJDEP) was set to expire on December 31, 1994. It is undisputed that the NJDEP had previously informed the taxpayer that it would not issue another waiver if the necessary federal fill permits were not received from the EPA and the ACE.
As of October 1,1994, taxpayer had not reached any settlement with the EPA or the ACE. Mr. Russo, along with his expert witnesses, testified that no reasonably knowledgeable purchaser would have any reason to believe that any significant portion of the subject property could ever be developed or used for purposes other than conservation or possible mitigation. In fact, as of October 1, 1994, the 1995 valuation date, it was reasonable to expect that the property could not be developed because the Water Quality Certificate waiver was due to expire at the end of the year and there was no expectation then that the waiver would be renewed.

Valuation Date: October 1, 1995

In December 1994, two months after the 1995 valuation date, the New Jersey Permit Extension Act was signed into law. This act allowed the taxpayer’s Water Quality Certificate waiver to *418 continue beyond its scheduled expiration date. In March 1995, as a result of negotiations with Mr. Russo, the EPA published a notice to reconsider the Section 404 veto which, if lifted, would have allowed the taxpayer to proceed with the filling of the 13.5-acre parcel. The FWS submitted strong opposition to the EPA’s published notice. The FWS urged that no additional filling be permitted on the subject site and that compensation be paid by the property owner for previous filling since the site was deemed ideal for unique vegetation and aquatic life germane to New Jersey wetlands. Also during this time, Mr. Russo received two letters from the NJDEP, which were admitted into evidence at trial. The first letter, dated April 21, 1995, objected to the development of the property because of the potential loss of wetlands during development. The second letter, dated May 25, 1995, indicated that settlement of this matter would necessarily involve issues relating to the subject property as well as other property owned by taxpayer in Ridgefield, and that such a settlement would benefit all parties involved.
On July 25, 1995, taxpayer requested that the ACE reconsider his previous permit application for public notice. Mr. Russo testified that he believed he was no closer to obtaining necessary permits at this moment then at any prior time. He had not received any response regarding the official status of the Section 404 veto, and he had not reached a settlement agreement with any federal agency which would permit the filling and development of the subject property. As a result, the Court of Federal Claims case, which was repeatedly delayed for settlement purposes, was reactivated, which Mr. Russo believed persuaded the ACE to step up settlement negotiations again.
On September 11, 1995, the EPA officially reversed the Section 404 veto and allowed the ACE to reconsider taxpayer’s fill permit application for the 13.5-aere parcel. Mr. Russo revised his fill permit application to include a small portion of the 6-acre parcel as well. Although the veto was lifted, the record disclosed that the taxpayer still needed to obtain another Water Quality Certificate and a Coastal Zone Management Plan Consistency Certificate *419 from the NJDEP. Also, a mitigation plan for the HMDC would have to be approved by the ACE prior to any fill and development of the subject property.
As of October 1, 1995, the valuation date for 1996, taxpayer had not obtained the necessary permits and had not resolved his case pending in the Court of Federal Claims. Despite the EPA’s agreement to reconsider taxpayer’s fill application, Mr. Russo claims he was no better off then October 1, 1994, the 1995 valuation date. This court agrees with the taxpayer on this issue. No evidence was introduced from which this court could evaluate if or when permits were to be granted.

Post Valuation Activity

It was not until March 1996 that the problems frustrating the permit process for the subject property were finally overcome. The HMDC agreed to waive testing on the property in Ridgefield and it was accepted as mitigation for filling of the subject property in Carlstadt. Taxpayer, on March 4,1996, requested a thirty day adjournment of the Court of Federal Claims case in order to finalize settlement negotiations. Fill permits were issued and the property was finally ready for development on March 18, 1996. The Court of Federal Claims case was settled the following day. As of March 1996, taxpayer was permitted to fill all of the remaining 13.5-acre parcel and a portion of the 6-acre parcel. Most of the 6-acre parcel was used for mitigation purposes which included wetland vegetation plantings and other modifications of the property as per the NJDEP. Although this activity occurred only six months after the October 1, 1995 valuation date, nothing significant occurred prior to that valuation date from which this court could conclude that taxpayer could have predicted the issuance of the necessary fill permit.

Expert Appraisal Reports

There is a clear difference between the appraisal experts’ analyses of the subject property. Although both utilize the sales comparison methodology, each appraiser works from a different *420 premise. Taxpayer’s appraisal expert essentially relied upon the report and recommendations of Mr. Cascino who concluded that, as of the valuation dates, the property was undevelopable by reason of the inability to obtain the necessary fill and development permits.
Mr. Cascino testified that at the time of each valuation date in question, the property was not developable in the foreseeable future. He based his report on that presumption. He concluded from his evaluation of the subject property that the highest and best use on the valuation dates at issue was open space or conservation.
Mr. Cascino indicated personal familiarity with both the Hackensack Meadowland District (and specifically the subject property) and the comparable sales utilized in .his report. He discussed eight land sales valued between $2,100 and $4,600 per acre. The properties used were essentially the same properties used by the plaintiff in Bergen County Assocs. v. East Rutherford Bor., 12 N.J.Tax 399 (Tax 1992), aff'd, 265 N.J.Super. 1, 625 A.2d 524 (App.Div.), certif. denied, 134 N.J. 482, 634 A.2d 528 (1993). In fact, the taxpayer’s appraisal expert relied upon Bergen County Assocs., where the court found that the weighted average of wetlands in the Berry’s Creek Center District area was $3,500 per acre for tax year 1990. The expert discussed differences in the size and location of the areas and the current uses of these properties. Other comparable sales he used consist, for the most part, of wetlands. From this information, as well as the aforementioned presumptions in Mr. Cascino’s analysis, taxpayer’s expert recommended a value of $4,000 per acre, or $78,000 for the entire 19.5 acres for each of the relevant years.
The municipality’s expert concluded that while there were development restrictions during the relevant tax years, it was foreseeable that the property could become developed within a reasonable period of time. He based this opinion upon the fact that, in March 1996, the taxpayer received a permit from the ACE to complete the filling of the property, which rendered the property developa *421 ble. Clearly, however, additional permits and approvals, such as building permits, would be necessary to fully develop the property.
The municipality’s expert also utilized a comparable sales approach to derive a value for the subject property on a per acre basis. His report, however, was based upon a determination that the highest and best use of the subject property was for future development of light industrial improvements. The expert then discussed eight comparable land sales that would accommodate such uses with per acre sales prices ranging from $228,000 to $303,000. The expert made adjustments for size, location, time configuration, and access, and concluded that the subject property’s value was $275,000 per acre. These sales are utilized by the expert for all years in question as if the property was immediately developable.
Using the per acre value of $275,000, the municipality’s expert determined, primarily based upon the issuance of the fill permit in March 1996, that a four year holding period was an appropriate assumption for the initial valuation date under appeal in this matter, October 1,1992. Utilizing a reversion factor of 15% along with the aforementioned information, the appraisal expert determined that the discounted per acre value for the aggregated property for each of the four years in issue was as follows:
Valuation Date Value per acre
10/01/92 $157,200
10/01/93 $180,812
10/01/94 $270,900
10/01/95 $239,100
The total value for the aggregated property opined by the municipality’s appraisal expert for each of the four years in issue was as follows:
Valuation Date Total Value
10/01/92 $3,065,000
10/01/93 $3,525,000
10/01/94 $4,055,000
10/01/95 $4,660,000
*422 It is clear from the record that as of the relevant valuation dates, the subject property was mired in lawsuits with no reliable indication that any filling and development approval was on the horizon. The record reveals meetings and memoranda which were usually inconsistent with one another. Meetings were followed by letters that failed to accurately memorialize any understanding as to the development of the property. Promised commitments continually fell through. Up to and including the most recent relevant valuation date, October 1, 1995, no evidence existed from which this court could conclude that development of the subject property was possible.
The municipality’s appraisal expert testified that the property is currently being filled and developed. Therefore, according to the expert, the property was “developable” to its highest and best use as light industrial property for all relevant valuation dates. He implied that the permit denials were due to taxpayer’s alleged violations with respect to other property he owned. Defendant claims that Mr. Russo’s problems were the unique result of his unwillingness to withdraw his multi-million dollar condemnation claim in the Court of Federal Claims which was initiated after the first valuation date.
It has long been established that property must be valued in its actual condition on the date of assessment. City of Newark v. West Milford Tp., 9 N.J. 295, 303-04, 88 A.2d 211 (1952); University Plaza Realty Corp. v. City of Hackensack, 12 N.J. Tax 354, 370 (Tax 1992), aff'd, 264 N.J.Super. 353, 624 A.2d 1000 (App.Div.), certif. denied, 134 N.J. 481, 634 A.2d 527 (1993). Facts or issues that become relevant regarding the issuance of fill permits issued after valuation dates should not be used to adjust valuations in this matter. This court’s previous ruling in Inmar Assocs. Inc. v. Carlstadt Bor., 7 N.J. Tax 482, 490, (Tax 1985), aff'd, 214 N.J.Super. 256, 518 A.2d 1110 (App.Div.1986) aff'd in part and rev’d in part, 112 N.J. 593, 549 A.2d 38 (1988) held that “[vjaluation should be based on facts and circumstances known or knowable as of the assessment date, unaided by hindsight.” See *423 also generally State v. Caoili 135 N.J. 252, 639 A.2d 275 (1994); State v. Gorga, 26 N.J. 113, 138 A.2d 833 (1958) (requiring valuation of condemned property based on information known on date of taking).
It is the determination of this court that the municipality’s expert appraisal report indeed values the property through hindsight in light of the granting of the necessary fill permits five months after the final valuation date in question. Post-assessment factors that are not reasonably foreseeable cannot be utilized since said factors were not available to the assessor. This is especially true when there was no indication that such an occurrence could possibly take place. There is nothing in the record which could give rise, with any reasonable degree of accuracy, as to a legitimate holding period, much less four years. Thus, the keystone of the municipality’s appraiser valuation approach must be eliminated, leaving his remaining theory to crumble.
Since the municipality’s appraisal expert did not offer comparables of the wetlands restriction, his analysis cannot be utilized in any fashion. Accordingly, this court finds that the taxpayer’s appraisal expert has provided the court with the only reliable evidence of value.
For the foregoing reasons, this court finds a value for the subject property of $4,000 per acre, or a total value for 19.5 acres of $78,000.
Tax year 1993 was a revaluation year, and thus the Chapter 123 ratio (N.J.S.A. 54:l-35a) is inapplicable. True value shall be the assessment which, as rounded by this court, is as follows:
Lot 9.0 Lot 9.01 Lot 9.02
Land $23,790 Land $31,890 Land 122,320
Improvements $ 0 Improvements $ 0 Improvements $ 0
Total $23,790 Total $31,890 Total $22,320
Total Aggregate Assessment: $78,000
With respect to the tax year 1994, the Chapter 123 ratio was 87.27% and is applicable. The ratio of assessment to true value is far above the upper limit of the common level range requiring relief for the taxpayer. Assessment for the 1994 tax year, as rounded by this court, is as follows:
*424 Lot 9.0 Lot 9.01 Lot 9.02
Land $20,770 Land $27,830 Land $19,500
Improvements $ 0 Improvements $ 0 Improvements $ 0
Total $20,770 Total $27,830 Total $19,500
Total Aggregate Assessment: $68,100
With respect to the tax year 1995, the Chapter 123 ratio was 87.70% and is applicable. The ratio of assessment to true value is far above the upper limit of the common level range requiring relief for the taxpayer. Assessment for the 1995 tax year, as rounded by this court, is as follows:
Lot 9.0 Lot 9.01 Lot 9.02
Land $20,870 Land $27,970 Land $19,575
Improvements $ 0 Improvements $ 0 Improvements $ 0
Total $20,870 Total $27,970 Total $19,575
Total Aggregate Assessment: $68,415
With respect to the tax year 1996, the Chapter 123 ratio was 87.57% and is applicable. The ratio of assessment to true value is far above the upper limit of the common level range requiring relief for the taxpayer. Assessment for the 1996 tax year, as rounded by this court, is as follows:
Lot 9.0 Lot 9.01 Lot 9.02
Land $20,840 Land $27,930 Land $19,550
Improvements $ 0 Improvements $ 0 Improvements $ 0
Total $20,840 Total $27,930 Total $19,550
Total Aggregate Assessment: $68,320
Judgment will be entered in accordance with this opinion.

 A formal written order was issued by the ACE on April 24, 1985.

 Mitigation, for purpose of this litigation, is the creation of wetlands from developable property or the flooding of uplands so as to create wetlands.