LASSER, P.J.T.C.
Taxpayer contests the 1990 and 1991 real property tax assessments on a pharmaceutical office and industrial complex located at Routes 202-206 and 287 in Bridgewater, New Jersey. The property is assessed as three parcels for 1990 and 1991 as follows:
Bloek 3702 Lot 7 (50.153 acres) (Bldgs B,C,CC,F,G, H,HX,HY,J,JD,JO, JR,JW,L,M,P & Q) Lot 11 Lot 12 (30 acres) (30.006 acres) (Bldgs. A,A-0,D, E,E1,E2,0 & R)
Land $ 6,394,500 $ 4,050,000 $ 3,600,700
Improvements 31,139,000 13,137,200 91,700
Total $37,533,500 $17,187,200 $ 3,692,400
The three assessments total $58,413,100. The common-level-ratio ranges as promulgated by the Director of the Division of Taxation for Bridgewater Township pursuant to N.J.S.A. 54:1-35.1 et seq. and the municipal tax rates are:
Common Level Lower Limit Upper Limit Tax Rate
1990 67.55% 57.42% 77.68% $2.36
1991 66.43% 56.47% 76.39% $2.42
The property consists of land approximately 110.159 acres in size on which 25 buildings were constructed between 1968 and 1990. The total building area is 818,405 square feet. The buildings constitute an integrated complex for research, testing, manufacturing and warehousing for the development and manufacture of pharmaceuticals and executive and administra *534 tive offices in connection therewith. The buildings contain approximately 430,000 square feet of office and laboratory space and 388,000 square feet of industrial, warehouse, animal research and other space.
A summary of the buildings follows:
Bldg. Lot Ident. _Type_ Sq.Ft. Area Year Built
11 A Office •65,494 1968
11 A-0 Link between A & B 3,800 1975
7 B Office 33,758 1970
7 C Office (Conf. rooms & health center) 15,570 1970
7 CC Cafeteria 16,018 1982
11 D Office 33.758 1970
11 E Office & laboratory 36.759 1970
11 E1/E2 Garage & storage 3,069 1970
7 F Powerhouse 14,986 1971
7 G Research & development 43,820 1970
7 H,HX,HY Animal buildings 32,398 1970(H) 1975(HX) 1982(HY)
7 J,JD,JO, JR,JW Warehouse & manufacturing 335,419 1970-90
7 L Chemical laboratory 53,042 1975
7 M Office 47,382 1974
11 O Office & computer bldg. 64,592 1975
7 P Solvent storage bldg. 491 1973
7 Q Pilot plant (explosion proof) 9,930 1977
11 R Maintenance bldg. 8,119 1974
Total square foot area 818,405
The offices, laboratories, research facilities, manufacturing and warehouse buildings are of good quality designed for the high standards required for pharmaceutical research, development, manufacture and distribution. Many buildings have specialized improvements which include “clean” rooms, special venting and plumbing, pipelines which deliver compressed air, gas and water to the laboratory and research areas, pressurized areas, animal care improvements, cafeterias and a fully-auto *535 mated warehouse with a ceiling height of 60 feet designed so that no human need enter to store or remove pharmaceuticals.
The entire complex is serviced by a powerhouse (Building F) which furnishes heat and chilled water to the other buildings in the complex. The property is located in a special economic development zone which permits the existing single-occupancy corporate use and cannot be subdivided. Taxpayer’s appraisal expert testified that although the office buildings cannot be rented to individual tenants under the existing zoning, much of the industrial space could be rented to individual users and the entire complex could be rented to a single user.
The parties have stipulated land value of the subject property to be $200,000 an acre, for a total of $22,030,000, and that the subject property has the same value as of October 1, 1989 and October 1, 1990, the assessing dates for the 1990 and 1991 tax years.
I.
Each party presented the testimony of one appraisal expert witness. Both appraisal experts have used the cost approach to value the property and both have used cost estimating services as a source for construction costs. In addition, taxpayer’s appraisal expert used the income approach, assigning a rental value to each of the buildings. Taxing district’s appraisal expert used two cost approach methods, first, estimating the replacement cost on October 1, 1989 by use of the Marshall Valuation Service cost figures and, second, trending up taxpayer’s actual construction cost of the improvements to October 1, 1989.
Taxpayer’s appraisal expert used reproduction cost as a starting point, basing costs on the pricing manuals, Marshall Valuation Service, Stevens Valuation Quarterly and R.S. Mean’s Building Construction Cost Data. This expert derived a reproduction cost new for the complex of $52,522,698. Taxpayer’s expert added $3,139,430 for site improvements including paving, roads, sidewalks, curbs, lighting, fencing, gate arms, *536 guardhouse, yard sheds, pump houses, steam and chiller piping and water, sewer and fire lines.
After applying physical depreciation averaging 15% to the buildings, which taxpayer’s expert described to be in good condition and well maintained with a remaining useful life of 40-50 years, he arrived at a depreciated value for the buildings of $44,453,393. Site improvements were depreciated by an average of 39% for a depreciated cost of $1,928,032. Taxpayer’s expert’s total depreciated improvement value before functional and economic obsolescence is $46,381,425. This expert deducted functional obsolescence of $2,319,071 (5%) and economic obsolescence[1] of $2,203,118 (5%) for a final improvement value of $41,859,236. He added land value of $22,030,000, for a total rounded value of $63,890,000.
The appraisal expert for the taxing district valued the land and improvements at $77,800,000, using the Marshall Valuation Service to estimate replacement cost. The replacement cost of the buildings amounted to $70,301,673. This cost was depreciated at varying rates ranging from 17% to 35%, depending upon the age of the building, for a rounded depreciated cost of $51,920,000. Taxing district’s expert added $3,850,000 to this figure as the depreciated value of the site improvements, for a total value of improvements of $55,770,000. He added land value of $22,030,000, for a total value of $77,800,000 by this cost approach method.
However, taxing district’s expert did not rely on his first cost approach method. He testified that this method does not account for the “numerous special features found in the subject property.” The special features he referred to include the robotic warehouse, the fire ponds and pumps and emergency power systems. Further, he stated that the Marshall Valuation Service does not adequately value “costs associated with the *537 laboratories, research, drug production and animal facilities” or three “explosion proof” areas.
The second cost approach method used by taxing district’s appraisal expert, and the approach on which he ultimately relied, utilized the actual construction costs as furnished by the taxpayer. This expert trended these costs up from the date expended to October 1, 1989 to arrive at a cost new. The total cost over a period of 21 years amounted to $47,629,012. This cost was adjusted using cost multipliers for the eastern United States as found in the Marshall Valuation Service. Using these adjusting factors, taxing district’s expert calculated an October 1, 1989 cost of $110,344,756. This cost was then depreciated at rates ranging from 0% to 35% depending on building age and condition. The resulting depreciated value was $80,736,075, to which this expert added land value of $22,030,000, for a total rounded estimated value of land and improvements of $102,-770,000.
Taxpayer’s appraisal expert’s income approach to value attributed a rental value to 436,229 square feet of office and laboratory space and 373,433 square feet of industrial, warehouse, storage and non-primary office and laboratory space (other space) in the subject property. Using seven office rentals to reflect the rental value of office and laboratory space and six industrial rentals to reflect the value of other space, taxpayer’s expert concluded that the office and laboratory space had a rental value of $18.50 a square foot and the other space had a rental value of $5.00 a square foot. The office and laboratory space total annual rental of $8,070,237 (436,229 sq. ft. X $18.50/sq. ft.) was reduced by a vacancy factor of 10% and by operating expenses of $2,050,058 to reflect net income before taxes of $5,213,155. This income was capitalized at 12.61% for a total value of office and laboratory space of $41,341,435.
The other space total annual rental of $1,867,165 was reduced by 10% for vacancy and 11% for expenses, which resulted in net income before taxes of $1,495,599. Taxpayer’s expert capitalized net income at 11%, for a value of $13,596,355. The total *538 value of land plus office and laboratory and other space amounted to $54,937,790, to which he added $3,400,000 for 17 acres of excess land, for a total rounded value of $58,340,000. This expert regarded the income approach as the most significant indicator of value of the subject because “facilities such as the subject are leased and financed on the open market” and concluded that his final value for the subject was $58,340,000.
The value conclusions of the two appraisal experts can be summarized as:
Taxpayer: Cost approach $ 63,890,000
Income approach 58,340,000
Final value $ 58,340,000
Taxing District: Cost approach #1 $ 77,800,000
Cost approach #2 102,770,000
Final value $102,770,000
II.
The subject property is an integrated office and manufacturing complex designed and constructed over a period of years to meet taxpayer’s needs for a facility to accommodate the research, development, manufacture and distribution of pharmaceuticals.
The appraisal experts agree that the current use of the complex for pharmaceutical research, manufacturing and warehousing is the highest and best use for this property. I agree, and find that the highest and best use for the property is its present use as an integrated pharmaceutical manufacturing complex. The unique features necessary to accommodate pharmaceutical research, including facilities for maintaining and conducting tests on animals and special atmosphere, humidity and climate control for the manufacture and storage of pharmaceuticals, contribute to a higher and more valuable use for the *539 subject than general purpose office and manufacturing space.[2]
Neither expert relied on the sales comparison approach to value. Taxing district’s appraisal expert stated that the subject complex is a unique blend of office and research facilities, encompassing over 818,000 square feet of diverse space on a 110-acre campus in a convenient setting that is desirable for attracting and keeping highly-skilled personnel. He stated that any attempt to compare the complex with individual structures would not reflect the snyergy obtained by the entirety, and the differences which would exist between potential “comparable” complexes would be too speculative to make any adjustments meaningful.
Taxpayer’s income approach does not attempt to value this property as a single economic unit but breaks out office space and industrial space and attributes rentals to these segregated units. This approach ignores the value of the property as a single economic unit. The property must be valued in its existing zoned use unless there is a probability of a change in zoning. Linwood Properties, Inc. v. Fort Lee, 7 N.J.Tax 320, 335 (Tax 1985) (citing State v. Gorga, 26 N.J. 113, 138 A.2d 833 (1958)). There is no evidence of such probability. Under the present zoning, the property cannot be subdivided and therefore must be sold as a unit.
Taxing district’s appraisal expert stated that there were no leases known to him of complexes of comparable size with the variety of structures and facilities similar to the subject. I find that conventional office buildings and warehouse and industrial buildings constructed for investment and general purpose rental cannot be compared with the subject and its unique features. I conclude that the income approach to value is not probative for valuing the subject.
I therefore give most weight to the cost approach valuation used by the appraisal experts based on the cost estimating *540 services as of October 1, 1989. In so doing, I am not valuing the property in use but at its value in exchange, based on the principle of substitution, i.e., what it would cost to replace this property in its condition on the assessing date. The property obviously has a higher value as a pharmaceutical complex than if it were broken up and rented for general office and manufacturing which would not utilize the unique features of the subject.
I find that although the cost approach to value is entitled to most weight in the valuation of this facility, the use of the actual historical cost trended up is an unreliable indicator of value in this case because more than half of the buildings were constructed during the 1968-1970 period. Trending up construction costs over a twenty-year period is not a reliable indication of current costs. American Institute of Real Estate Appraisers, The Appraisal of Real Estate 362 (9th ed. 1987). Further, costs used by the taxing district’s appraisal expert include taxpayer’s cost of machinery and equipment (for example, warehouse robotics), which is used in the pharmaceutical business, rather than having as its primary purpose to support, shelter, contain, enclose or house persons or property.[3]
I have carefully reviewed the cost figures used by the appraisal experts as well as considered their testimony and find that the replacement cost figures used by the appraisal expert for the taxing district more nearly reflect the quality and unique features of the subject buildings without including personal property. However, I deduct 3% for functional obsolescence due to the plenum ceiling construction of 277,000 square feet of office area. I have reduced taxpayer’s expert’s 5% figure because the plenum ceiling condition does not affect *541 the entire complex. I find no justification for deducting external obsolescence because of the absence of proof that external influences have reduced the value of the subject. I therefore find that the depreciated value of the buildings is $50,362,400 ($51,920,000 minus 3%).
The value of the site improvements must be added to the depreciated building value. Taxpayer’s expert finds the cost of site improvements to be $3,139,430, while taxing district’s expert finds the cost to be $4,472,519, including $2,010,000 for landscaping. Taxpayer’s expert depreciates his cost by an average of 39%, resulting in a depreciated cost for site improvements of $1,928,032, while taxing district’s expert depreciates his improvements (but not landscaping) by 25%, for a depreciated cost for site improvements of $3,850,000.
Plaintiff’s appraisal expert did not include landscaping in his site improvements cost, presumably because it was included in his land value. Defendant’s appraisal expert added landscaping costs in addition to his land value. I find that the land value of $200,000 an acre is adequate to include landscaping and therefore do not include landscaping in site improvement costs. Deducting landscaping cost from taxing district’s expert’s site improvements figure yields $1,840,000 as the depreciated cost of site improvements as compared to taxpayer’s expert’s cost of $1,928,032. I accept taxing district’s figure as reasonable and adopt his site improvements depreciated cost figure.
Adding the indicated value of the buildings of $50,362,400 to the depreciated value of the site improvements of $1,840,000 and the stipulated value of the land of $22,030,000 yields a value for the subject by the cost approach of $74,232,400 as follows:
Depreciated Cost of Buildings $50,362,400
Depreciated Cost of Site Improvements 1,840,000
Land Value as stipulated 22,030,000
Rounded Total $74,232,400
*542 Based on the cost approach to value, I conclude that the subject property as of the assessing dates had a rounded value for local property tax assessment purposes of $74,232,000.
The total assessment of the three parcels that comprise the complex is $58,413,100. Since this total represents 78.69% of $74,232,000, the assessment exceeds the upper limit of the common-level range for the years 1990 and 1991 and must be reduced to the common level of assessment. Therefore, the assessment for 1990 must be reduced to 67.55% of value, or $50,144,000 (rounded) and the assessment for 1991 must be reduced to 66.43% or $49,312,000 (rounded). I allocate this reduction to land at the rate of $200,000 an acre. The improvements are allocated to Lots 7 and 11 in accordance with taxing district’s expert’s depreciated costs, but I have accepted the improvements assessment on Lot 12 as reflecting the value of the site improvements on that lot in the absence of proof to the contrary.
The 1990 and 1991 assessments must therefore be changed to:
1990 (67.55%) Lot 7 Lot 11 Lot 12 Total
Land $ 6,775,000 $ 4,053,000 $4,053,000 $14,881,000
Impvts 25,675,000 9,496,300 91,700 35,263,000
Total $32,450,000 $13,549,300 $4,144,700 $50,144,000
1991 (66.43%)
Land $ 6,663,000 $ 3,985,500 $3,985,500 $14,634,000
Impvts 25,248,300 9,338,000 91,700 34,678,000
Total $31,911,300 $13,323,500 $4,077,200 $49,312,000
Judgment will be entered accordingly.

 This expert attributed his 5% functional obsolescence to 277,000 square feet of office space with plenum ceilings. He testified that new office buildings have ducts instead of plenums. This expert’s economic obsolescence rate of 5% is an attempt to reflect the vacancy rate in the area.

 For example, unlike general industrial space, the subject production and animal research areas are air-conditioned.

 Chapter 24 of the Laws of 1992 (Business Retention Act) applies to all cases pending on the date of enactment, June 29, 1992. This act excludes from real property, machinery, apparatus or equipment "used or held for use in business which is neither a structure nor machinery, apparatus or equipment the primary purpose of which is to enable a structure to support, shelter, contain, enclose or house persons or property."