# TAX COURT OF NEW JERSEY



**JOSHUA D. NOVIN**
**Judge**

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

## NOT FOR PUBLICATION WITHOUT THE APPROVAL
## OF THE TAX COURT COMMITTEE ON OPINIONS

April 22, 2022

Lawrence P. Cohen, Esq.
Lavery, Selvaggi, Abromitis & Cohen, P.C.
1001 Route 517
Hackettstown, New Jersey 07840

Kevin P. Benbrook, Esq.
Benbrook & Benbrook, LLC
1734 Route 31, Suite 1
Clinton, New Jersey 08809

Michael A. Hazen, Esq.
Janata, Lacap & Hazen, LLC
Crossroads Corporate Center
One International Boulevard, Suite 400
Mahwah, New Jersey 07495

Re:   Phillipsburg Mall c/o Namdar Realty Corp. v. Lopatcong Township
Docket Nos. 007449-2016; 002773-2017; 006216-2018; 003180-2019;
and 002464-2020

Phillipsburg Mall c/o Namdar Realty Corp. v. Pohatcong Township
Docket Nos. 007490-2016; 002776-2017; 006254-2018; 005293-2019;
and 002455-2020[1]

Dear Mr. Cohen, Mr. Benbrook, and Mr. Hazen:

This letter constitutes the court's opinion in the above-referenced matters on defendants'

motions, under R. 4:40-1, for entry of judgments at trial.[2]

For the reasons explained more fully below, defendants' motions are granted.  Accordingly,

because the court finds plaintiff has failed to overcome the presumption of validity that attaches to

---

[1]  Trial also included H&R Phillipsburg, LLC v. Pohatcong Township, docket numbers 006261-2018, 005286-2019, and 002834-2020.  However, after trial plaintiff withdrew those complaints.
[2]  Alternatively, defendants requested entry of judgments following trial, affirming the local property tax assessments.


Interpreter


ADA
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



the 2016, 2017, 2018, 2019, and 2020 local property tax assessments, and defendants' have failed to offer evidence of the property's true value with respect to their counterclaims, the assessments are affirmed.

## I.    Procedural History and Factual Findings

Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law based on the evidence and testimony adduced during trial.

As of the valuation dates at issue, Phillipsburg Mall, LLC c/o Namdar Realty Corp. ("plaintiff") was the owner of the real property and improvements located at 1200 Route 22 East, in Lopatcong and Pohatcong Townships, Warren County, New Jersey (the "subject property"). The subject property is identified on Lopatcong Township's ("Lopatcong") municipal tax map as Block 102, Lot 9.01, and on Pohatcong Township's ("Pohatcong") municipal tax map as Block 1, Lot 1.01 (Lopatcong and Pohatcong are collectively referred to as "defendants").[3]  The Lopatcong lot comprised approximately 33 to 35-acres as of the valuation dates, and the Pohatcong lot comprised approximately 37 to 43-acres as of the valuation dates.[4]

Plaintiff instituted these direct appeals challenging the subject property's 2016, 2017, 2018, 2019, and 2020 tax year assessments.  Lopatcong filed counterclaims for the 2017, 2018, 2019, and 2020 tax years.  Pohatcong filed counterclaims for the 2016 and 2019 tax years.

---

[3]   The Case Information Statement for docket number 002776-2017 misidentified the subject property as Block 1, Lot 1.02.  Accordingly, the court hereby amends the pleading to correct the property identifier. See R. 4:9-2.
[4]  Because the subject property was subdivided and portions sold during the tax years at issue, the subject property's total acreage fluctuated.






The subject property has been historically operated and is improved with a one-story regional mall, containing approximately 558,204 square feet of gross leasable area and several outbuildings containing restaurant pad sites.[5] Plaintiff acquired the mall in 2013 for reported consideration of $11,500,000. Following acquisition, plaintiff subdivided the subject property creating several outparcels and "condominiumized" the mall. Between 2014 and 2015, plaintiff sold the four restaurant pad site outparcels for consideration totaling $5,314,760.[6] In addition, on or about October 23, 2017, plaintiff sold the unit containing the Kohl's department store for $2,600.000, reducing the mall's gross leasable area to 475,379 square feet.[7] In or about August 2018, the roof of the retail store site formerly occupied by Sears collapsed. Following the roof collapse, plaintiff demolished the former Sears and former Bon-Ton store sites, resulting in a further reduction in the mall's gross leasable area to 300,635 square feet.[8]

During trial, plaintiff offered testimony from a State of New Jersey certified general real estate appraiser who, after voir dire and without objection, was accepted by the court as an expert

---

[5] The subject property also has seven "raw stores" that "are within the footprint of the mall." However, these areas were never developed into occupied retail stores and thus, were not included by plaintiff's expert (as defined herein) in the 558,204 square feet of gross leasable area.

[6] Plaintiff's expert identified the sales as: (i) Block 1, Lot 1.03 – 1194 Route 22, Pohatcong, sold on December 15, 2014, for $1,600,000 consideration; (ii) Block 1, Lot 1.04 – 1196 Route 22, Pohatcong, sold on April 2, 2015, for $1,689,760 consideration; (iii) Block 1, Lot 1.05 – 1198 Route 22, Pohatcong, sold on June 10, 2015, for $675,000 consideration; and (iv) Block 102, Lot 9.03 – 1200 Route 22, Lopatcong, sold on September 1, 2015, for $1,350,000 consideration.

[7] Plaintiff's expert identified this outparcel as Block 1, Lot 1.01, Unit 200, 1200 Route 22, Pohatcong, sold on October 23, 2017, for $2,600,000 consideration (the "Kohl's store").

[8] Although not relevant to the valuation dates involved herein, plaintiff's expert testified that on or about November 20, 2019, plaintiff executed a sales contract for the subject property with CRG Acquisition, LLC, for $28,875,000 (without the Kohl's store), or $35,150,000 (with the Kohl's store), subject to zoning change approvals.






in the field of property valuation (the "expert").[9] [10]  Plaintiff's expert prepared an appraisal report expressing opinions of the subject property's true or fair market value as of the October 1, 2015, October 1, 2016, October 1, 2017, October 1, 2018, and October 1, 2019 valuation dates.

As of each valuation date, the subject property's local property tax assessments, and implied equalized values are set forth below:

| Valuation dates | Lopatcong's tax assessment | Average ratio of assessed to true value | Lopactong's implied equalized value |
|---|---|---|---|
| 10/1/2015 | $11,096,200 | 100% | $11,096,200 |
| 10/1/2016 | $11,096,200 | 99.83% | $11,115,096 |
| 10/1/2017 | $11,096,200 | 99.97% | $11,099,530 |
| 10/1/2018 | $8,596,200 | 98.44% | $8,732,426 |
| 10/1/2019 | $8,596,200[11] | 99.15% | $8,669,894 |

| Valuation dates | Pohatcong's tax assessment | Average ratio of assessed to true value | Pohatcong's implied equalized value |
|---|---|---|---|
| 10/1/2015 | $17,977,200 | 99.91% | $17,993,394 |
| 10/1/2016 | $17,977,200 | 99.32% | $18,100,282 |
| 10/1/2017 | $17,977,200 | 95.92% | $18,741,868 |
| 10/1/2018 | $15,442,400 | 95.42% | $16,183,609 |
| 10/1/2019 | $15,442,400[12] | 94.29% | $16,377,559 |

---

[9]  During voir dire, plaintiff's expert testified that he had been qualified by the court as a property valuation expert in other matters.  However, he acknowledged that prior to this appraisal assignment, he had never performed an appraisal of a New Jersey regional mall.

[10]  Defendants identified a New Jersey certified general real estate appraiser as a proposed testifying property valuation expert witness.  However, following plaintiff's presentation of its proofs, defendants elected not to elicit testimony or evidence from its proposed testifying property valuation expert witness.

[11]  Plaintiff's Case Information Statement and plaintiff's expert's appraisal report both identify the 2020 tax year assessment as $8,596,200.  However, plaintiff's counsel's post-trial submission asserts that it is $8,346,200.

[12]  Plaintiff's Case Information Statement and plaintiff's counsel's post-trial submission both identify the 2020 tax year assessment as $15,442,400.  However, plaintiff's expert's appraisal report asserts that it is $17,977,200.






Plaintiff's expert valued the subject property as a single economic unit, reaching the following value conclusions: (i) $7,000,000, as of the October 1, 2015 and October 1, 2016 valuation dates; (ii) $6,000,000, as of the October 1, 2017 valuation date; (iii) $5,500,000, as of the October 1, 2018 valuation date; and (iv) $5,750,000, as of the October 1, 2019 valuation date.

Lopatcong offered testimony from its professional planner, who was accepted by the court, without objection, as an expert in the field of professional planning and zoning. In addition, Pohatcong offered testimony from its professional planner and engineer, who was accepted by the court, without objection, as an expert in the fields of engineering and professional planning.

At the close of the evidence, defendants moved, under R. 4:40-1, for entry of judgments at trial and requested the opportunity to submit briefs detailing the alleged deficiencies in plaintiff's evidence.[13]

In support of their motions, defendants advance several arguments. First, defendants emphasize that plaintiff's expert possessed inadequate knowledge and understanding of Lopatcong's and Pohatcong's zoning ordinances, zoning map, and the permitted uses identified thereunder. Accordingly, plaintiff's expert's highest and best use analyses and conclusions were materially flawed. Second, defendants contend that in performing his sales comparison approach, plaintiff's expert identified property sales that bore uses not permitted under defendants' zoning ordinances. Specifically, defendants argue that because plaintiff's expert "thought that the permitted uses for this [subject] property included warehousing," distribution centers, and

---

[13] Alternatively, defendants contend that, should the court not grant their motions, following trial and after weighing the evidence, the court should nonetheless enter judgments affirming all tax years assessments.






industrial uses, his reliance on certain sales identified as comparable was misplaced. Third, defendants argue that in performing his income capitalization approach plaintiff's expert failed to employ market or economic rents. Charging that it was improper for plaintiff's expert to rely on anchor tenant leases executed in 1989, 1994, and 2004. In sum, defendants argue that because plaintiff's expert's highest and best use analyses, and sales comparison and income capitalization approaches to value were so "fraught with errors, mistakes and misrepresentation of law," that the court should accord them no weight. As a result, defendants maintain that plaintiff failed to overcome the presumption of validity that attaches to the local property tax assessments in these matters.

In addition, in support of their request for entry of judgments following trial, defendants emphasize that cross-examination disclosed numerous "errors, misconceptions, [and] faulty conclusions" in both plaintiff's income capitalization and sales comparison approaches to value. As a result of these errors, defendants argue that plaintiff has not proven, by a fair preponderance of the evidence, the subject property's true or market value requiring the court to affirm all years' local property tax assessments.

In opposition to defendants' motions and in support of its request for judgments reducing the subject property's tax assessments, plaintiff argues that viewing the evidence presented, with the benefit of all reasonable inferences, a debatable question was raised as to the validity of the local property tax assessments. Plaintiff highlights the 2013 sale of the subject property and the body of evidence that plaintiff's expert considered under his income capitalization and sales comparison approaches to value. Moreover, plaintiff submits that defendants have offered no valuation expert testimony challenging the opinions and conclusions reached by plaintiff's expert.

   

Therefore, plaintiff argues that defendants' motions must be denied, and judgments should be entered reducing the subject property's 2016, 2017, 2018, 2019, and 2020 tax year assessments.

The court observes that plaintiff's brief lacks any detailed discussion regarding plaintiff's expert's highest and best use analysis, as vacant, or plaintiff's expert's highest and best use analysis, as improved for the 2019 and 2020 tax years, two of the core themes of defendants' motions. In response to defendants' motions, plaintiff's brief summarily states only that "[t]he expert concluded a highest and best use to be continued use as an enclosed regional shopping mall. This conclusion considered the on-going positive cash flows for the identified period as well as the lack of further plans for development during this same time." Moreover, plaintiff contends that "[t]he expert concluded the property would be best developed with an eye towards some industrial use. If . . . industrial use[] is not legally permitted, nonetheless the evidence presented indicates a vast over-assessment." However, plaintiff fails to reconcile how plaintiff's expert reached the conclusion that the subject property's highest and best use, as vacant (for all tax years), and as improved (for the 2019 and 2020 tax years), was for industrial and distribution/warehousing, a use not permitted under either Lopatcong's or Pohatcong's zoning ordinances.

## II. Conclusions of Law

### A. Presumption of Validity/motion for judgment or involuntary dismissal

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). The presumption "attaches to the quantum of the tax assessment." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985). Accordingly, the taxpayer shoulders the






burden of proving that the local property tax assessment is incorrect. Only through the introduction

of "cogent evidence" of true value; that is, evidence "definite, positive and certain in quality and

quantity to overcome the presumption," that a taxpayer fulfills this obligation. <u>Aetna Life Ins. Co.</u>

<u>v. Newark City</u>, 10 N.J. 99, 105 (1952). Thus, the presumption of validity applies "until sufficient

competent evidence to the contrary is adduced." <u>Little Egg Harbor Twp. v. Bonsangue</u>, 316 N.J.

Super. 271, 285-86 (App. Div. 1998).

However, the presumption should not be viewed "simply an evidentiary presumption

serving . . . as a mechanism to allocate the burden of proof. It is, rather, a construct that expresses

the view that in tax matters, it is to be presumed that governmental authority has been exercised

correctly and in accordance with law." <u>Pantasote Co.</u>, 100 N.J. at 413. In sum, at the close of

plaintiff's case, the court must be presented with competent evidence that raises a "debatable

question as to the validity of the assessment." <u>MSGW Real Estate Fund, LLC</u>, 18 N.J. Tax at 376.

A motion for judgment or involuntary dismissal may be brought either at the close of

plaintiff's case, under <u>R.</u> 4:37-2(b), or at the close of all the evidence, under <u>R.</u> 4:40-1. <u>See</u>

<u>Verdicchio v. Ricca</u>, 179 N.J. 1, 30-32 (2004). However, regardless of when such motions are

presented, the court's review is governed by the same standard. That inquiry requires the trial

court to:

> accept[] as true all the evidence which supports the position of the
> party defending against the motion and accord[] him the benefit of
> all inferences which can reasonably and legitimately be deduced
> therefrom. . . .
>
> [<u>Estate of Roach v. TRW, Inc.</u>, 164 N.J. 598, 612 (2000) (quoting
> <u>Sons of Thunder, Inc. v. Borden, Inc.</u>, 148 N.J. 396, 415 (1997)
> (quoting <u>Dolson v. Anastasia</u>, 55 N.J. 2, 5-6 (1969)) (citations and
> quotations omitted from original).]

   

In deciding such a motion, the court must view the evidence presented as "uncontradicted" and accord the non-moving party the "benefit of all legitimate inferences" which can be deduced therefrom. Verdicchio, 179 N.J. at 30-32. See also MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376 (concluding that "plaintiff must . . . present[] evidence sufficient to demonstrate the value of the subject property, thereby raising a debatable question as to the validity of the assessment . . . , the court, in deciding whether the plaintiff's evidence satisfies the standard . . . , must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence.")

However, one notable distinction exists between motions presented under R. 4:37-2(b) and R. 4:40-1. Motions offered under R. 4:37-2(b) are brought at the conclusion of plaintiff's case and thus, limit the court's evaluation only to plaintiff's evidence. (See R. 4:37-2(b), stating "after having completed the presentation of the evidence . . . the plaintiff shall so announce to the court, and thereupon the defendant without waiving the right to offer evidence in the event the motion is not granted, may move for a dismissal. . . ."). Conversely, motions presented under R. 4:40-1, "may be made by a party either at the close of all the evidence or at the close of the evidence offered by an opponent." (Emphasis added). Thus, when a motion under R. 4:40-1 is presented "at the close of all the evidence," the court is afforded access to all evidence presented. However, the court must nonetheless accord the non-moving party the "benefit of all legitimate inferences" which can be deduced therefrom. Estate of Roach, 164 N.J. at 612.

Accordingly, when presented with a motion for judgment or involuntary dismissal, the trial court's decision turns upon an evaluation of the evidence. Therefore, the court's consideration of






defendants' motions begins with a discussion of the evidence presented and the first phase of the valuation process, the highest and best use analysis.

### B. Highest and Best Use

An indispensable element not only to principles of property valuation but to the determination of a property's true or market value is discerning its highest and best use. Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988), aff'd o.b., 12 N.J. Tax 244 (App. Div. 1990), aff'd, 127 N.J. 290 (1992). See also General Motors Corp. v. City of Linden, 22 N.J. Tax 95, 107 (Tax 2005). Highest and best use is defined as "[t]he reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value." Appraisal Institute, The Dictionary of Real Estate Appraisal 93 (5th ed. 2010). "For local property tax assessment purposes property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). Thus, the highest and best use analysis is often referred to as "the first and most important step in the valuation process." Ford Motor Co., 10 N.J. Tax at 161.

Importantly, an appraiser's highest and best use conclusion must not be based on a property's in-use value because that may reflect only the property "owner's use or subjective judgment as to how a property should be used." Clemente v. Township of South Hackensack, 27 N.J. Tax 255, 268 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015). Rather, in determining a property's highest and best use, an appraiser must sequentially consider "the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Ibid. Moreover, in analyzing an improved property's highest and best use, the appraiser should select the "use that maximizes an






investment property's value, consistent with the rate of return and associated risk." <u>Ford Motor</u>

<u>Co.</u>, 127 N.J. at 301.

Here, after reviewing defendants' zoning maps and zoning ordinances, plaintiff's expert

concluded that the subject property was in Lopactong's "HB/ROM; Highway Business/Research

Office Manufacturing" zoning district and in Pohatcong's "B-3; Highway Business zone."

According to plaintiff's expert, permitted uses in Lopatcong's HB/ROM districts include

farms, retail and personal service establishments, all uses permitted in the Research Office

Manufacturing zone,[14] commercial indoor and outdoor recreation facilities, and solar energy

facilities (as an accessory use).[15] Plaintiff's expert further expressed that the permitted uses in

Pohatcong's "B-3; Highway Business zone" include professional offices, banks and financial

institutions, stores and shops for retail sales and services, full-service restaurants, houses of

worship, clubs, lodges, and charitable and fraternal organizations, hotels and motels, scientific or

research laboratories, office buildings, farms, fast-food restaurants, animal kennels, and wireless

telecommunication equipment.[16] After reviewing the permitted uses, plaintiff's expert concluded

---

[14] Plaintiff's expert identified Lopatcong's Research Office Manufacturing zone as permitting uses including warehouse and distribution centers, industry (involving the processing, assembly, packaging and storage of previously refined materials), offices, computer and data processing centers, scientific, engineering and/or research laboratories, integrated industrial/office parks, co-location of wireless telecommunication equipment, hospital support services, mini-warehouse/self-storage facilities, flexible office/warehouse, and solar energy facilities.

[15] Plaintiff's expert's report identified the following conditional uses in the HB zone: (i) service stations; motor vehicle or automobile service stations, filling or gasoline stations or motor vehicles or automobile repairs garages; (ii) advertising signs; and (iii) massage, bodywork, and somatic therapy.

[16] Plaintiff's expert's report identified the following conditional uses in the B-3; Highway Business zone: (i) day-care or child-care centers; (ii) service stations; (ii) wireless communication towers; (iii) billboards; (iv) small wind energy systems; and (v) freestanding solar arrays.






that use of the subject property as a regional mall is a legal, conforming use.

    1.    <u>As vacant</u>

Notably, plaintiff's expert's appraisal report did not identify a specific highest and best use, as vacant, for the subject property. Rather, under the "legally permitted uses" section of the report plaintiff's expert states, "Lopatcong permits distribution warehouse uses in their HB/ROM zone; however . . . Pohatcong's zone does not permit and would require approvals. . . ." Further, under the "financially feasible" heading, the report details that, "[b]ased upon the legally permitted uses, development of a range of commercial/industrial uses can be considered for the site." Finally, under the "maximally productive" section of his report plaintiff's expert states that the subject property's highest and best use, as vacant, "would be to develop the site with a use to the maximum density permitted by the HB/ROM and B-3 Zones."

During trial, plaintiff's expert reasonably testified that his highest and best use, as vacant, analysis was influenced by his review of development in the marketplace. According to plaintiff's expert, "you don't see regional malls being developed anywhere, so there's probably a good reason regionally malls aren't being developed." In his opinion, because there is "limited retail development going on . . . but there is industrial development going on, so . . . I would skew my financially feasible [analysis] towards a range of commercial/industrial, could be considered for the site overall." He continued, "commercial/industrial, you know towards that side, I mean towards industrial side. . . ." Plaintiff's expert further explained that "when you drive around [Routes] 78, 22 all you see are these warehouse buildings going up, you hardly ever see a shopping center, let alone a regional mall, very, very, few offices, . . . so, I went towards the industrial side because . . . what the subject property did was sell . . . the outparcels . . . along Route 22 . . . and






now you're behind these lots, and you know, you're not going to build a shopping center back there, but an industrial building, especially one to service all these retail centers, now that you have e-commerce, Amazon, and Wish, and these others popping up, that's why I skewed [my highest and best use, as vacant conclusion] towards an industrial development." He concluded by stating, "I would . . . skew it towards industrial, but that's going to require some work with both Townships, . . . so you're going to have to apply for approvals, you're going to have to get a variance . . . there is a lot of maybes here because this is hypothetical in nature, I can't conclude definitely, but it's a lot of maybes. . ."

   2.    As improved

For the 2016, 2017, and 2018 tax years, plaintiff's expert's report states that due to the subject property's "high rate of vacancy for the past several years" and the closures of "malls across the country . . . due to retailer crisis," as of the October 1, 2015, October 1, 2016, and October 1, 2017 valuation dates, the subject property's highest and best use, as improved, was continued use as a regional mall.

However, for the 2019 and 2020 tax years, plaintiff's expert's appraisal report similarly fails to identify a specific highest and best use for the subject property as improved. Rather, the report states the subject property's highest and best use, as improved, "is for the demolition of the current improvements and redevelopment of the underlying land in accordance with the [sic] each township's zoning."

During trial, plaintiff's expert explained that "for the first couple of years, [the subject property] was still producing a positive net income, so I concluded . . . that the actual mall itself was the highest and best use, [but] the writing was on the wall that if they didn't renovate or figure






out some better tenancy, there were going to be issues, and then of course, there were issues." However, for the 2019 and 2020 tax years, he expressed that the subject property "was no longer producing a positive net income, and at this point it was obvious that . . . demolition of the mall and reuse of the site would be best highest and best use." Thus, in plaintiff's expert's opinion, for the 2019 and 2020 tax years, the subject property's highest and best use, as improved, was "skewed" towards redevelopment with an industrial use.

    3.    <u>Analysis</u>

When embarking on a highest and best use analysis, the appraiser must interpret "the market forces that affect the subject property and identify[] the use or uses on which the final opinion of value is based." Appraisal Institute, <u>The Appraisal of Real Estate</u>, 42 (14th ed. 2013). An appraiser must closely examine the zoning ordinances applicable to the parcel being appraised "for all possible [permitted] uses and [select] that use which will yield the highest return. . . ." <u>Inmar Associates, Inc. v. Edison Twp.</u>, 2 N.J. Tax 59, 64 (Tax 1980). In sum, the highest and best use is truly an analysis, interpretation, and "economic study of market forces focused on the subject property." Appraisal Institute, <u>The Appraisal of Real Estate</u>, 305 (11th ed. 1996).

Following voir dire, defendants stipulated to plaintiff's expert's qualifications in the real property valuation field, and the court agreed. <u>See</u> N.J.R.E. 702 (stating that an individual possessing knowledge, skill, experience, training, or education may be qualified by the court as an expert and offer opinion testimony). Although qualified as an expert and permitted to offer opinion testimony, the expert's opinion must nonetheless be rooted in "facts, or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence[,] but which is the type of data normally

   

relied upon by experts.'" Polzo v. County of Essex, 196 N.J. 569, 583 (2008); N.J.R.E. 703. An expert's opinion that lacks a credible foundation and "consist[s] of bare conclusions unsupported by factual evidence is inadmissible." Rosenberg v. Tavorath, 352 N.J. Super. 385, 401 (App. Div. 2002). The expert's opinion must have objective support and may not be based on a standard that is strictly personal. See Pomerantz Paper Corp. v. New Comm. Corp., 207 N.J. 344, 373 (2011). Thus, the worth, significance, and "probative utility of an expert's opinion stands or falls on the facts and reasoning offered in its support." Bonsangue, 316 N.J. Super. at 284.

Here, the evidence disclosed that, contrary to plaintiff's expert's belief, no part of the subject property is in Lopatcong's Research Office Manufacturing zone ("ROM"). Rather, a close examination of Lopatcong's zoning map divulged that the subject property is entirely in Lopatcong's HB - Highway Business District ("HB") and PD – Planned Development District overlay zones ("PD").[17][18] Moreover, Lopatcong last revised its zoning map on July 15, 2010, approximately five years prior to the earliest valuation date involved herein. Thus, either plaintiff's expert incorrectly interpreted Lopatcong's zoning map or reviewed an outdated map.[19]

Additionally, despite plaintiff's expert belief that the HB zoning ordinance allows all uses

---

[17] The term overlay zone "refers to a situation in which a municipality leaves in place the existing zoning regulations applicable to an area, but superimposes an additional set of requirements." Weeden v. City Council of Trenton, 391 N.J. Super. 214, 225 (App. Div.), certif. den., 192 N.J. 73 (2007). In sum, an overlay zone affords additional development opportunities, provided that certain ordinance parameters are met. Here, Lopatcong's PD overlay zone required a minimum of 50-acres of land to afford those additional development opportunities.

[18] During trial, plaintiff's expert acknowledged that he likely relied on an August 2004 Lopatcong zoning map. However, evidence was elicited during trial that on or about July 6, 2005, Lopactong amended its zoning map.

[19] Plaintiff's expert testified that he reviewed a black and white version of Lopatcong's zoning map; however, his appraisal report did not contain a copy of the zoning map that he reviewed.

   

permitted under the ROM zone, a careful review of Lopatcong's zoning ordinance revealed that only three ROM uses are permitted in the HB zone.[20] Specifically, Lopatcong's HB zoning ordinance recites that the permitted uses under the ROM zoning ordinance are limited to: (4) offices for business, executive, professional and administrative purposes; (10) mini-warehouse/self-storage facility (subject to additional requirements); and (12) solar and photovoltaic energy facilities. Stated differently, industrial and distribution/warehousing uses are not legally permitted in the HB zone absent a variance or zoning ordinance change. Moreover, the court's review of the applicable provisions of the zoning ordinance reveals that it was last amended in November 2011, approximately four years prior to the earliest valuation date involved herein.

In addition, trial testimony revealed that as of each valuation date involved herein, industrial and distribution/warehousing uses were not permitted in Pohatcong's B-3 Highway Business zoning district.

Finally, during cross-examination, in response to questions whether plaintiff's expert ever reached "a specific" conclusion regarding the subject property's highest and best use, as vacant (for all tax years), and as improved (for the 2019 and 2020 tax years), plaintiff's expert responded,

> . . . because you've got an issue here, you are dealing with two towns, two different municipalities, two different mayors, both on record wanting different things for the property, I mean, it, yeah, you have a lot of choices to choose from, hence, . . . I said permitted to what can be permitted by the zone, with a skewing towards industrial.

In undertaking a highest and best use analysis, although the legally permissible and physically possible criteria can be considered in either order, both criteria must be applied before

---

20 Township of Lopatcong Zoning and Land Use Ordinance, § 243-74(A)(4).






consideration is given to the financially feasible and maximally productive criteria. Our courts have repeatedly emphasized that:

> Tests of legal permissibility and physical possibility <u>must</u> be applied before the remaining tests of financial feasibility and maximal productivity. A use may be financially feasible, but this is irrelevant if it is physically impossible or legally prohibited. Only when there is a reasonable possibility that one of the prior, unacceptable conditions can be changed is it appropriate to proceed with the analysis.
>
> [<u>Mori v. Town of Secaucus</u>, 15 N.J. Tax 607, 619 (Tax 1996), <u>rev'd on other grounds</u>, 17 N.J. Tax 96 (App. Div. 1997) (quoting Appraisal Institute, <u>The Appraisal of Real Estate</u>, 280 (10th ed. 1992)) (emphasis in original).]

<u>See also</u> <u>County of Monmouth v. Hilton</u>, 334 N.J. Super. 582, 588 (App. Div. 2000); <u>Schimpf v. Little Egg Harbor Twp.</u>, 14 N.J. Tax 338, 344 (Tax 1994); Appraisal Institute, <u>Appraisal of Real Estate</u>, 335 (14th ed. 2013) (concluding that "[i]n practice, the tests of physical possibility and legal permissibility can be applied in either order, but they must be applied before the tests of financial feasibility and maximum productivity.")

Here, plaintiff's expert valued the subject property as a single economic unit, expressing in his report that the subject property's highest and best use, as vacant, "would be to develop the site with a use to the maximum density permitted by the HB/ROM and B-3 Zones." Thus, plaintiff's expert's report failed to identify a specific highest and best use, as vacant, for the subject property. However, an appraiser's recitation of a zoning ordinance, along with a generic statement that the property could be developed or redeveloped in accordance with all legally permitted uses identified under the ordinance, offers no meaningful insight or analysis of a property or its






marketplace. Rather, such statements, when accurate, constitute mere factual recitations and do not amount to a comprehensive highest and best use analysis or evaluation.

"The proper determination of highest and best use requires a comprehensive market analysis to ascertain the supply and demand characteristics of alternative uses." Clemente, 27 N.J. Tax at 269 (citing Six Cherry Hill, Inc. v. Cherry Hill Twp., 7 N.J. Tax 120, 131 (Tax 1984), aff'd, 8 N.J. Tax 334 (App. Div. 1986)). Importantly, the "highest and best use conclusion should specify the optimal use (or uses), when the property will be put to this use or achieve stabilized occupancy, and who would be the most likely purchaser or user of the property." Clemente, 27 N.J. Tax at 269 (citing The Appraisal of Real Estate, 139 (13th ed. 2008)) (emphasis added). Thus, an appraiser must not only evaluate all legally permitted uses identified under the zoning ordinance but must reconcile those uses against examinations of what is physically possible, financially feasible, and select the use that will be most maximally productive. See Inmar Associates, Inc. v. Edison Twp., 2 N.J. Tax 59, 64 (Tax 1980).

Notwithstanding the deficiencies in plaintiff's expert's reports, plaintiff's expert's testimony truly revealed that his highest and best use analysis, as vacant (for all tax years), and as improved (for the 2019 and 2020 tax years), was fatally flawed. Seemingly unaware that industrial and distribution/warehousing uses were not legally permitted in Lopatcong's HB zone or in Pohatcong's B-3 zone as of any of the valuation dates at issue, plaintiff's expert expressed that his highest and best use analysis, as vacant (for all tax years), and as improved (for the 2019 and 2020 tax years), were "skewed towards an industrial development." Moreover, when presented with the zoning ordinances, zoning maps, and evidence that industrial and distribution/warehousing uses are not be permitted under either the HB or B-3 zones, plaintiff's expert was unable to quantify






how this information would alter his highest and best use analysis and conclusions. Instead, responding, "I would have to sit down and go through it . . . I don't know if my [highest and best use] conclusions would change, but I am still leaning towards an industrial use . . ."

In applying the legal permissibility test, an appraiser must determine what "uses are [legally] permitted by current zoning, [and] which uses could be permitted if a zoning change were reasonably probable. . . ." The Appraisal of Real Estate, 338 (14th ed.). In attempting to discern the true or market value of a property, the court may consider how a potential zoning change may alter or affect a property's use and, correspondingly, its value, provided evidence is adduced sufficient to warrant a determination that such change is reasonably probable. See State v. Caoili, 135 N.J. 252, 265 (1994); State by State Highway Comm'r v. Gorga, 26 N.J. 113 (1958). In sum, the "proposed use must not be remote, speculative, or conjectural." Clemente, 27 N.J. Tax at 269 (citing Penns Grove Gardens, Ltd. v. Borough of Penns Grove, 18 N.J. Tax 253, 263 (Tax 1999); Ford Motor Corp., 10 N.J. Tax at 167); Borough of Saddle River v. 66 East Allendale, LLC, 216 N.J. 115, 139 (2013) (stating that part of the court's analysis requires consideration of the "reasonable probability of future site plan approval [or zoning changes] when determining fair market value. . . ."); Linwood Properties, Inc. v. Ft. Lee Borough, 7 N.J. Tax 320, 328-29 (Tax 1985) (stating that "except in the most unusual cases, it is unlikely that an increment in value in anticipation of a zone change or variance from the zoning ordinance requirements may be added to reflect the probability of such action."); Hoechst Celanese Corp. v. Bridgewater Twp., 12 N.J. Tax 532, 539 (Tax 1992) (stating that "property must be valued in its existing zoned use unless there is a probability of a change in zoning").






Here, plaintiff's expert opined that his highest and best use analysis, as vacant (for all tax years), and as improved (for the 2019 and 2020 tax years), were "skewed towards an industrial development," "distribution warehouse," or "industrial uses." However, the evidence revealed that industrial and distribution/warehousing uses were not permitted in either Lopactong's HB zone or Pohatcong's B-3 zone. Thus, because industrial uses were not permitted during the tax years at issue, to render his highest and best use conclusions reasonable and credible, it was incumbent upon plaintiff's expert to demonstrate that a reasonable probability existed for a zoning change. However, plaintiff's expert failed to offer any evidence demonstrating that defendants were contemplating a zoning change as of any of the valuation dates involved herein or that other similarly situated property owners or contract purchasers had made applications for a zoning change and that such applications were approved.[21]

An appraiser's unsupported assumptions of a zoning change or grant of variance relief for a use that is not legally permitted renders the appraiser's highest and best use analysis wholly deficient. The party proposing a specific highest and best use for a property that assumes a zoning change or variance relief from zoning requirements must "produce[] credible evidence that a potential use is reasonably practicable and reasonably probable." Caoili, 135 N.J. at 263 (quoting United States v. 341.45 Acres of Land, 605 F.2d 762, 817 (5th Cir. 1979)).

---

[21] The only testimony elicited from plaintiff's expert regarding zoning changes arose in connection with the November 20, 2019 sales contract. Plaintiff's expert testified that on November 20, 2019, plaintiff executed a sales contract for the subject property with CRG Acquisition, LLC, for $28,875,000 (without the Kohl's store), or $35,150,000 (with the Kohl's store), subject to zoning change approvals.






To enable plaintiff's expert to conclude the subject property's highest and best use, as vacant (for all tax years) and as improved (for the 2019 and 2020 tax years), was for industrial and distribution/warehousing uses, he was required to objectively evaluate economic conditions, demand in the marketplace, public records, and other extrinsic evidence, to discern whether a variance or zoning change was reasonably probable. Yet, plaintiff's expert failed to offer any analysis, evaluation, or other credible evidence demonstrating that a zoning change was reasonably probable as of any valuation dates involved herein. Moreover, neither plaintiff's expert's report nor his testimony revealed that his highest and best use conclusions were based on the report, analysis, or opinions of a professional planner engaged in investigating possible zoning and land use relief for the subject property under the parameters of N.J.S.A. 40:55D-70.

To overcome the presumption of validity that attaches to the local property tax assessment, the plaintiff shoulders the burden of proving that the subject property's assessment is erroneous. However, when a plaintiff has failed to offer cogent evidence, based on sound theory, raising a debatable question of the property's value, then "judgment should be entered dismissing the appeal thus affirming the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

Here, viewing the evidence presented in the light most favorable to the non-moving party and affording plaintiff all reasonable and legitimate inferences which can be deduced therefrom, the court finds that plaintiff has not met that threshold. For the reasons detailed above, plaintiff's expert's highest and best use analyses, as vacant (for all tax years) and as improved (for the 2019 and 2020 tax years), were fundamentally flawed. Plaintiff's expert's highest and best use conclusions lacked a credible foundation, analysis, and objective support and, thus, were entitled to no weight. Thus, because the first phase of plaintiff's valuation analysis was defective the court






need not embark on a further examination and analysis of the valuation evidence proffered by plaintiff.

### III.    Conclusion

For the foregoing reasons, the court grants defendants' motions, under R. 4:40-1, for entry of judgments at trial. Based on the fatal flaws disclosed in plaintiff's expert's highest and best use analyses, the court concludes that plaintiff has failed to overcome the presumption of validity that attaches to the local property tax assessments. Because plaintiff has failed to overcome the presumption of validity that attaches to the local property tax assessments, the court need not evaluate and weigh the valuation evidence presented by plaintiff in these tax appeal matters. Moreover, the court finds that defendants have offered no evidence of the subject property's true or fair market value. Accordingly, the court affirms the 2016, 2017, 2018, 2019, and 2020 local property tax assessments.

Very truly yours,


Hon. Joshua D. Novin, J.T.C.




